PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANDREW MAXWELL,

    *Plaintiff-Appellant,*

v.

KRISTINA MAXWELL,

    *Defendant-Appellee.*

No. 08-1945

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:08-cv-00254-RJC-CH)

Argued: September 22, 2009

Decided: November 30, 2009

Before AGEE, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Margaret B. SEYMOUR, United States District
Judge for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Judge Seymour wrote the
opinion, in which Judge Agee and Senior Judge Hamilton
joined.

## COUNSEL

Neil Joshua Saltzman, LAW OFFICE OF NEIL J. SALTZ-
MAN, New York, New York, for Appellant. Bradley B. Hon-

nold, THE HONNOLD LAW FIRM, PA, Charlotte, North Carolina, for Appellee.

## OPINION

SEYMOUR, District Judge:

### I. BACKGROUND

The following facts were found by the District Court subsequent to an evidentiary hearing held on July 31, 2008. Andrew and Kristina Maxwell met and married in Australia in 1999, and shortly thereafter moved to Massachusetts. On January 18, 2004, the couple's quadruplets were born with developmental disabilities. The couple became estranged in December 2005. At that time, Andrew moved back to Australia. Kristina, the quadruplets, and Kristina's daughter from a previous marriage, Gabi, moved to North Carolina to live with Kristina's mother.

In 2006, Kristina filed for divorce in North Carolina and Andrew subsequently initiated a child custody action there as well. In August 2007, Andrew traveled from Australia to North Carolina for the custody hearing. During Andrew's stay in North Carolina, he and Kristina discussed reconciliation, resolved their custody dispute, and decided to discontinue the divorce action. On August 16, 2007, the parties signed a Memorandum of Judgment ("Memorandum") issued by the General Court of Justice in Mecklenburg County, North Carolina that granted Kristina primary custody of the quadruplets. The Memorandum was later incorporated into a Consent Order ("Order") entered by the Superior Court of Mecklenburg County, North Carolina, on October 25, 2007.[1]

---

[1]The Order grants Kristina "the permanent care, custody, and control" of the quadruplets, and grants Andrew "visitation" rights. The Order requires Kristina to "confer with [Andrew] on all decisions regarding the health, education[,] religion and welfare of the [quadruplets]," and grants Andrew the right of "input on all major decisions regarding the [quadruplets]." J.A. 645-648.

Following the couple's decision to reconcile, Andrew traveled back to Australia, while Kristina and the children remained in North Carolina. At the onset, both parties had trust issues. In particular, Kristina was concerned that Andrew was using the couple's reconciliation as a means to gain custody of the quadruplets.[2] She was also concerned that Andrew was still seeing his girlfriend, Maryanne Land ("Maryanne"). Andrew agreed to end his relationship with Maryanne, but not before he confirmed that Kristina had ended her relationship with her male friend, Derek Otten.

Despite their trust issues, the couple began making arrangements for Kristina and the children to move to Australia. Initially, the couple communicated frequently. Kristina began preparing for the move to Australia by (1) collecting the information needed to get permanent Australian residency for her and Gabi; (2) giving Andrew permission to obtain Australian passports for the quadruplets; (3) helping Andrew look for a house;[3] (4) helping Andrew purchase a minivan; (5) briefly inquiring about work as a licensed practical nurse in Australia; (6) exploring information technology and bartending programs in Australia; and (7) telling friends and family that her move was permanent.[4]

---

[2]The district court determined that "Kristina credibly testified (without rebuttal from Andrew) that her suspicions were first aroused during the custody proceedings when Andrew mentioned that the Hague Convention would protect [her]." J.A. 349 (internal citations omitted). According to the district court, Kristina's suspicions prompted her to register the Memorandum of Judgment and the Order with Family Court in Australia. Kristina registered the Memorandum on September 9, 2007 and the Order on December 18, 2007. The registration for the documents was finalized on September 26, 2007 and December 18, 2007, respectively.

[3]Kristina and Andrew did not purchase a home in Australia; instead, Andrew rented a home under a six-month term lease in his name only. The couple discussed the possibility of purchasing a home closer to Andrew's parents in Wallongong, Australia once the lease term expired.

[4]Kristina sent several e-mail messages to friends informing them that she and Andrew planned to reconcile and live in Australia together with the children.

Kristina continued to suspect that Andrew was using the reconciliation as a means to gain custody of the quadruplets. She also learned that Andrew was still seeing Maryanne. The couple began to communicate less frequently and experience financial hardship.[5] Kristina considered that the move to Australia might be temporary, so she purchased round trip tickets with a departure date of December 4, 2007 and a return date of March 4, 2008. She arranged for herself and the children to travel with Australian tourist visas that placed a three-month limit on their stay in Australia. Before leaving the United States, Kristina sought permission from Gabi's school to allow Gabi to resume classes at the school in March of the following year. Kristina also maintained the lease and insurance on her car, and kept her cell phone account, bank account, and North Carolina Medicare insurance.

Kristina and the children traveled to Australia on December 6, 2007. They brought the following items: photographs of the family, jewelry and perfume; bedding, blankets, linen, household cutlery, dishes, pots and pans; bike helmets; portable DVD players; one month of prescription medication for Kristina; summer clothing; Andrew's power tools and flashlights; Gabi's school records; the quadruplets' and Gabi's medical and immunization records.

The couple experienced marital difficulties after Kristina and the children arrived in Australia. Their trust issues persisted and they argued frequently. Andrew became violent towards Kristina and threatened to remove her from the house. Within a few weeks of the move, Andrew asked Kristina if she would continue to live in Australia if their marriage failed. After she responded in the negative, Andrew took the following items from Kristina to prevent her from leaving

---

[5]Because of the couple's financial hardship, Kristina had to sell a cherished sewing machine and the children's play set, and the couple argued over whether Kristina should sell other items to prevent defaulting on her car lease.

Australia with the children: (1) the quadruplets' passports, which he kept at his office; (2) copies of Kristina's and Gabi's passports, which he later returned; and (3) copies of the Order.

Kristina immediately sought legal advice from a solicitor regarding Andrew's confiscation of the passports. Upon learning of Kristina's actions, Andrew posed as Kristina in an e-mail message in an attempt to have the Order lifted. He also placed the children on the U.S. State Department's passport alert list, ripped out the "solicitor" section of the local Yellow Pages, and disabled Kristina's internet access on her computer. Despite Andrew's attempts to prevent Kristina from leaving Australia with the children, Kristina continued to seek legal advice. She was advised by a solicitor that she could either ask the U.S. Embassy for interim passports or seek a court order requiring return of the passports. However, neither option was feasible at the time because the interim passport application required the signature of both parents, and the process for obtaining a court order was too expensive.

When Kristina realized that she was not going to be able to leave Australia immediately, she filled out permanent residency applications for herself and Gabi, filled out paperwork to enroll Gabi in school and the quadruplets in preschool and YMCA classes,[6] and began attending marital counseling with Andrew. Kristina continued to seek legal assistance during this time. In February 2008, just two months after Kristina and the children arrived in Australia, the U.S. Embassy agreed to reissue the family's passports without Andrew's consent. Kristina and the children left immediately and returned to the United States.

When Andrew noticed that Kristina and the children were

---

[6]The parties dispute whether the children were actually enrolled in classes. The parties do not dispute that no tuition was ever paid and the children never attended any classes.

not home, he obtained an ex parte restraining order from the Family Court of Australia to prevent Kristina from removing the quadruplets from Australia. By then Kristina and the children had already departed. Kristina phoned Andrew the day she arrived in the United States, and they discussed the possibility of living separately in Australia and sharing custody of the children. However, those plans soon fell through. Kristina filed a domestic violence protection order after Andrew threatened over the phone to kill her and left messages for the children calling Kristina a drug addict.

On June 5, 2008, Andrew filed a petition for wrongful removal in the United States District Court for the Western District of North Carolina, Charlotte Division under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.*, which implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (Oct. 25, 1980).

The district court entered an order denying Andrew's petition on September 2, 2008. The district court made the following findings of fact: Kristina's testimony should be credited and Andrew's testimony should not be credited;[7] Andrew failed to sustain his burden of proof; Gabi's testimony corroborated her mother's testimony; and Kristina's intention before and after the move was that the move to Aus-

---

[7]The district court concluded that Kristina's "version of the events . . . should be credited, and [Mr. Maxwell], who has the burden of proof, has failed to sustain that burden because his version should not be credited." The court went on to state that Mr. Maxwell's "credibility was undercut by: (1) several instances in which he misrepresented facts in his Petition or seemingly contradicted his own testimony; and (2) his singular intention, perhaps beginning as early as July 2007, to gain permanent custody of the Children in Australia, followed by his repeated steps to prevent Kristina from leaving Australia with the Children, demonstrated notably by his confiscation of the Children's passports so she could not leave." The court also found that the testimony of Kristina's daughter Gabi "was convincing and corroborative of her mother's testimony." J.A. 346-347.

tralia would be conditional. Based on those findings of fact, the district court held that (1) Andrew failed to prove by a preponderance of the evidence that the habitual residence of the children was Australia, and (2) even if the children were habitual residents of Australia, the return of the children to the United States was not a wrongful removal or retention in breach of Andrew's rights of custody under Australian law because the Order did not grant Andrew custody rights. Andrew timely filed his appeal from the district court's order and we have jurisdiction under 28 U.S.C. § 291 and 42 U.S.C. § 11603(a).

## II.    DISCUSSION

### A.    Issues on Appeal

On appeal, Andrew contends that the district judge erred in his findings regarding (1) the habitual residence of the quadruplets immediately prior to the alleged removal from Australia; and (2) the custody rights of the parties. First, with regard to the quadruplets' habitual residence, Andrew contends that the district court erred in determining that the children's place of habitual residence at the time of their removal from Australia was the United States; failing to determine the parties' last shared intention regarding what their children's habitual residence would be, and consequently failing to ascribe appropriate significance to the last shared intention when determining what the children's place of habitual residence was at the time of their removal from Australia; and by finding as a matter of fact that Kristina's relocation to Australia with the children was intended to be experimental and contingent, or in the alternative failing to apply the common law principle of estoppel to prevent Kristina from denying the permanency of her intentions. Second, with regard to his custody rights, Andrew argues that the district court erred in finding that he did not enjoy custody rights in relation to the children at the time of their removal from Australia; and by failing to properly interpret the North Carolina custody order upon

which it relied when it found that Andrew did not enjoy custody rights at the time of the children's removal from Australia.

## B.    Standard of Review

On appeal, the district court's findings of fact are reviewed for clear error and its legal conclusions regarding domestic, foreign, and international law are reviewed *de novo*. *Ruiz v. Ruiz*, 392 F.3d 1247, 1251 (11th Cir. 2004); *Silverman v. Silverman*, 338 F.3d 886, 896-97 (8th Cir. 2003) (en banc); *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001); *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995). Therefore, we must "accept the district court's historical or narrative facts unless they are clearly erroneous, but exercise plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Feder*, 63 F.3d at 222 n.9.

## C.    Analysis

The Hague Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access." Hague Convention, pmbl., 19 I.L.M. at 1501. To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that the child has been "wrongfully removed." 42 U.S.C. § 11603(e)(1)(A).

Specifically, the petitioner must establish that: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal; (2) the removal was in breach of the petitioner's custody rights under the law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (citing Hague Convention, art. 3, T.I.A.S.

No. 11,670, at 2, 19 I.L.M. at 1501). Consequently, if we affirm the district court's finding on the habitual residence issue, the remaining issue regarding Andrew's custody rights will become moot and not require consideration by this court. Thus, the crux of the issue on appeal is whether the district court's determination that the quadruplets' habitual residence was the United States at the time they were removed from Australia is clearly erroneous.

The framers of The Hague Convention intentionally left "habitual residence" undefined, and intended that the term be defined by the unique facts in each case. *See Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004). Federal courts have developed a two-part framework to assist in the habitual residence analysis. Under this framework, the first question is whether the parents shared a settled intention to abandon the former country of residence. *See Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001); *Ruiz*, 392 F.3d 1252 ("We summarize the approach suggested in *Mozes* . . . and adopt it as our own. . . . The first step towards acquiring a new habitual residence is forming a settled intention to abandon the one left behind. It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary.") (internal citation omitted); *Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005) ("We agree [with *Mozes*] and conclude that courts should begin an analysis of a child's habitual residence by considering the relevant intentions. Focusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location. This allows an observer to determine whether the child's presence at a given location is intended to be temporary rather than permanent.").

The second question under this framework is whether there was "an actual change in geography" coupled with the "passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment." *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir.

2007) (quoting *Mozes*, 239 F.3d at 1078). These two questions are addressed separately below.

### 1.    Shared Parental Intent

The Ninth Circuit's opinion in *Mozes v. Mozes* has served as a guide for federal courts in determining parental intentions in Hague Convention cases. *See Papakosmas*, 483 F.3d at 622; *Gitter*, 396 F.3d at 131-32; *Ruiz*, 392 F.3d at 1255; *Whiting*, 391 F.3d at 548-49; *Silverman*, 338 F.3d at 899. In *Mozes*, the Ninth Circuit recognized that "[d]ifficulty arises, of course, when the persons entitled to fix the child's residence no longer agree on where it has been fixed—a situation that, for obvious reasons, is likely to arise in cases under the Convention." *Mozes*, 239 F.3d at 1076.

The *Mozes* court divided these cases into three broad factual categories. In the first category are cases where "the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." *Id.* In the second category are those cases "where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period." *Id.* at 1077. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence. *Id.*

The third category of cases is comprised of "[i]n between cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." *Id.* at 1076-77. Following *Mozes*, another category of cases developed. In this category are those cases where courts have refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis. *See Papakosmas*, 483 F.3d at 625-26; *Ruiz*, 392 F.3d at 1254; *Gitter*, 396 F.3d at 135; *McKenzie v. McKenzie*, 168 F. Supp. 2d 47, 54 (E.D.N.Y. 2001).

In cases where there is a dispute regarding a child's habitual residence, "the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence." *Gitter*, 396 F.3d at 135 (considering the subjective intentions of parents to determine whether the parents shared an intent to adopt a new country of residence for their children); *Feder*, 63 F.3d at 224 (same). Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence;[8] the purchase of a home in the new country and the sale of a home in the former country;[9] marital stability;[10] the retention of close ties to the former country;[11]

---

[8]*See Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004) (treating the length of a father's tour of military duty in Germany as evidence of the parents' intentions regarding their move from the United States to Germany); *Feder,* 63 F.3d at 224 (concluding that a mother and father's pursuit of employment in Australia supported finding that the parents intended to abandon the United States as their child's habitual residence).

[9]*See Papakosmas*, 483 F.3d at 627 (distinguishing its facts from *Feder* and concluding that a family's failure to purchase or seek out a permanent home in Greece supported finding that the parents did not share an intent to abandon the United States as the children's habitual residence); *Feder*, 63 F.3d at 224 (treating the purchase and renovation of a new home in Australia as evidence that the parents intended to abandon the United States and adopt Australia as their child's habitual residence).

[10]*See Ruiz*, 392 F.3d at 1255 (treating the parent's marital problems as objective evidence that the family's move from the United States to Mexico was intended to be conditional).

[11]*See id.* (concluding that a mother's retention of financial accounts and a mailing address in the United States supported finding that her family's move from the United States to Mexico was intended to be conditional); *Papakosmas*, 483 F.3d at 627 (concluding that a family's ongoing hotel business in the United States coupled with the mother's trip from Greece back to the United States to check on the business weighed in favor of finding that the parents did not share an intent to abandon the United States as their children's habitual residence); *Gitter*, 396 F.3d at 135 (finding that a father's decision to close bank accounts in the United States and open Israeli bank accounts was evidence that the father intended to abandon New York and adopt Israel as the family's new residence).

the storage and shipment of family possessions;[12] the citizen-ship status of the parents and children;[13] and the stability of the home environment in the new country of residence.[14]

In the case at bar, Andrew argues that Kristina's conduct before the move to Australia indicates that she intended that the move would be indefinite. Specifically, Andrew points to the following conduct: Kristina's sale of her cherished personal items; her failure to tell her family and friends that her move to Australia was conditional; her statement to family and friends on the day before she departed that "[t]his is our last night in the U.S.;" and her completion of permanent residency applications for herself and Gabi. We find that the district court properly considered this conduct and correctly determined that "much of this evidence is equivocal as these actions would be appropriate even if Kristina and the Children were planning on living in Australia temporarily, as per the Custody Order, or on a trial basis." J.A. 363.

Andrew also places great emphasis on the letters that Gabi received from teachers and friends with statements wishing her good luck "on her new life in Australia," and saying "goodbye," "good luck," and "I will miss you." The district court also considered this evidence in its analysis and prop-

---

[12]*Gitter*, 396 F.3d at 135; *Silverman*, 338 F.3d at 898 (both considering the storage and/or shipment of family possessions as evidence of the intended permanency of the move to the new country of residence).

[13]*Ruiz*, 392 F.3d at 1255 (finding that a set of parents did not share an intent to abandon the United States and adopt Mexico as their children's residence in part because the mother and children traveled to Mexico on tourist visas and did not seek or acquire permanent Mexican residency or citizenship); *Mozes*, 239 F.3d at 1082 (finding that a set of parents did not share an intent to abandon Israel and adopt the United States as their children's residence in part because the father and children traveled to the United States with temporary visas).

[14]*Papakosmas*, 483 F.3d at 627 (citing the fact that the children's lives were in a "permanent state of flux" in Greece as support for concluding that the children had not become acclimatized to Greece).

erly concluded that the weight that Andrew places on these letters is undermined by the fact that Kristina sought permission from Gabi's school to allow her to miss the first portion of the spring semester and return to school in March.

Moreover, the district court appropriately determined that the following facts support the conclusion that Kristina intended that the move to Australia would be conditional: Kristina left many possessions behind in North Carolina; Kristina reserved round trip tickets for herself and the children; Kristina and the children traveled with Australian tourist visas that limited their stay in Australia to three months; and Kristina maintained her local financial accounts, North Carolina Medicare insurance, and the lease and insurance on her vehicle.

Moreover, the record supports the district court's determination that Kristina never intended to abandon the United States as the quadruplet's residence after the family arrived in Australia. This determination is supported by the fact that Kristina sought to return to the United States just five weeks after she arrived in Australia. Although Kristina did fill out permanent Australian residency applications for herself and Gabi, the district court determined to be plausible her testimony that she only did so because Andrew took a number of measures to prevent her from leaving Australia. Moreover, in light of the district court's determination that Kristina's testimony was credible and Andrew's testimony was not credible, we cannot conclude that the district court was clearly erroneous in its conclusion that there was no shared parental intent to abandon the United States as the quadruplets' habitual residence. Accordingly, the district court's finding that there was no shared parental intent to abandon the United States as the quadruplets' habitual residence is not clearly erroneous.

## 2.    Acclimatization

Once parental intent has been considered, federal courts next determine the extent of the child's acclimatization to the new country of residence. The question here "is not simply whether the child's life in the new country shows some minimal degree of settled purpose," but whether the "child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Mozes*, 239 F.3d at 1081 (internal quotations and citations omitted). Federal courts have considered school enrollment,[15] participation in social activities,[16] the length of stay in the relative countries,[17] and the child's age[18] to determine the extent of a child's acclimatization to the new country of residence.

The district court determined that the quadruplets never became acclimatized to Australia during their two-month stay. We agree with this finding, as there are several objective factors supporting the district court's conclusion.[19] First, the qua-

---

[15]*See Ruiz*, 392 F.3d at 1255; *Silverman*, 338 F.3d at 898-899; *Feder*, 63 F.3d at 224 (all considering children's school enrollment as evidence of acclimatization); *Silvestri v. Olivia*, 403 F. Supp. 2d 378 (D.N.J. 2005).

[16]*See Ruiz*, 392 F.3d at 1255; *Holder*, 392 F.3d at 1020 (both considering children's social activities as evidence of acclimatization).

[17]*See Ruiz*, 392 F.3d at 1255; *Holder*, 392 F.3d at 1018; *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001); *Feder*, 63 F.3d at 224 (all considering the children's length of stay in the countries at issue as evidence of acclimatization).

[18]*See Holder*, 392 F.3d at 1019 (noting that the five-year age gap between two boys was "relevant to the acclimatization analysis" and that therefore a separate discussion of the boys' acclimatization was warranted).

[19]The district court noted that the only evidence that the quadruplets had become settled in Australia were affidavits and testimony of Andrew's friends and relatives who commented that the children seemed "happy" while attending a wedding two days after they arrived in Australia. The

druplets were not receiving therapy for their developmental disabilities in Australia despite the fact they were receiving therapy when they lived in the United States. Second, the quadruplets did not attend school or participate in social activities in Australia. And, finally, the quadruplets' developmental disabilities made it very unlikely that they became acclimatized during their two-month stay in Australia.

## III.    CONCLUSION

We find the district court correctly determined that Andrew failed to prove by a preponderance of the evidence that the quadruplets' habitual residence was Australia. Kristina did not intend to abandon the United States as the quadruplets' residence and the children did not become acclimatized to Australia. Accordingly, we affirm the district court's decision on the issue of habitual residence and thus affirm the judgment of the district court.[20]

*AFFIRMED*

---

district court correctly determined that this evidence is "insufficient," since "[t]he function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." (quoting *Mozes*, 239 F.3d 1079 (internal citations omitted)).

[20]In light of our conclusion that the district court correctly determined the children did not habitually reside in Australia, we need not consider the remaining issues Andrew presents on appeal.