**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-2309**

———————

MARITZA MESZAROS REYES,

        Petitioner - Appellant,

    v.

HARRY LEE LANGFORD JEFFCOAT,

        Respondent - Appellee.

———————

Appeal from the United States District Court for the District of
South Carolina, at Columbia.  Joseph F. Anderson, Jr., District
Judge.  (3:12-cv-00298-JFA)

———————

Argued:  October 31, 2013      Decided:  December 20, 2013

———————

Before GREGORY, SHEDD, and KEENAN, Circuit Judges.

———————

Affirmed by unpublished opinion.  Judge Keenan wrote the
opinion, in which Judge Gregory and Judge Shedd joined.

———————

**ARGUED**: Rebecca Guental Fulmer, LAW OFFICES OF WILMOT B. IRVIN,
Columbia, South Carolina, for Appellant.  Reid Thomas Sherard,
NELSON MULLINS RILEY & SCARBOROUGH, LLP, Greenville, South
Carolina, for Appellee.  **ON BRIEF**: Wilmot B. Irvin, LAW OFFICES
OF WILMOT B. IRVIN, Columbia, South Carolina; James T. McLaren,
MCLAREN & LEE, Columbia, South Carolina, for Appellant.  Timothy
E. Madden, Greenville, South Carolina, William C. Wood, Jr.,
NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South
Carolina, for  Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

This appeal involves an action brought under the Convention on the Civil Aspects of International Child Abduction (the Hague Convention) and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11603. Maritza Meszaros Reyes (the mother) alleges that her husband, Harry Lee Langford Jeffcoat (the father), wrongfully retained the couple's child (the child) in the United States in 2011,[1] when the child's place of habitual residence was Venezuela. The district court concluded that the child's habitual residence was the United States on the date of the alleged retention and that, therefore, the father did not wrongfully retain the child in the United States. Upon our review, we affirm the district court's judgment.

I.

The mother, a citizen of Venezuela, and the father, a citizen of the United States, were married in Venezuela in 1993 and lived there together until 2001. During that time, the mother worked as an attorney at an international law firm. The child was born in Venezuela in 2000. He is a dual citizen of

---

[1] The mother and the father have three children born of the marriage. However, because the middle and eldest children are over the age of 15, they are not subject to the Hague Convention and their places of habitual residence are not at issue in this case. See Hague Convention art. 4.

2

Venezuela and the United States and holds a passport issued by both countries. In 2001, after the father accepted a banking job in South Carolina, the mother took a two-year leave of absence from her law firm and the family moved together to South Carolina. However, due to the ill health of the mother's parents, the mother and the child returned to Venezuela between 2003 and 2005, while the father remained in South Carolina.

Despite returning to Venezuela, the mother became a permanent resident of the United States in 2003, obtaining a "green card" that remained valid through the summer of 2013. The Venezuelan resident visa that the father had acquired expired in 2003 and has not been renewed. Since that time, the father always has traveled to Venezuela as a tourist, and on each trip is limited to a 90-day visit during which he is not permitted to obtain employment.

At issue in this case is the place of the child's habitual residence from 2006 through September 12, 2011, the date that he allegedly was wrongfully retained in South Carolina. By 2006, the child had returned from Venezuela to South Carolina to live with the father, who had resigned from his banking job and had enrolled as a student in a seminary. The child attended a private school in South Carolina during the 2006-2007 and 2007-2008 academic years.

3

Also in 2006, the parents initiated plans to construct a 5,000 square foot house on land they had purchased in South Carolina in 1996 (the house). Their construction loan application and associated note were signed by both parents and indicated that the house would be their "primary residence." The mother participated extensively in designing and decorating the house and, in total, the family has invested $1.1 million in its construction and furnishings. The father and the child ultimately moved into the house in July 2008.

In the period between 2006 to 2008, the mother continued working in Venezuela and traveled regularly to South Carolina during weekends and holidays. During that time, the child visited the mother in Venezuela during school holidays. In November 2006, with the consent of the father, the mother purchased a condominium in Caracas for $650,000 (the condominium). That residence has space for each child to have his or her own bedroom and bathroom.

During the period beginning in the autumn of 2008, and ending in the summer of 2011, the father and the child traveled regularly between the United States, where they lived in the house in South Carolina, and Venezuela, where they lived in the condominium. Over this period of frequent travel, the child spent about 45% of his time in the United States and 55% of his

4

time in Venezuela. The child participated in extensive extracurricular activities in both countries.

The child was not registered in "brick and mortar" schools from 2008 to 2011, but instead received home schooling instruction beginning with the 2008-2009 academic year. The father administered the child's home school lessons through the South Carolina Association of Independent Home Schools (SCAIHS). However, the parents did not notify SCAIHS regarding the substantial amount of time that the child was spending in Venezuela.

In June 2011, the father and the child traveled from Venezuela to South Carolina using "one-way" airline tickets. The mother and the child's maternal grandmother visited the child in South Carolina from September 2, 2011 through September 12, 2011. Without the father's knowledge, the mother had purchased airline tickets for the child to return with her to Venezuela on September 12, 2011.

According to the mother's testimony, the father refused to permit the child to return to Venezuela on that date as originally planned. The father, however, testified that the parties had not previously discussed whether the child would travel to Venezuela in September 2011, but that they eventually agreed that the child would not leave South Carolina at that time. The child since has remained in the United States.

5

In January 2012, the mother filed a "Verified Petition for Return of Child" pursuant to the Hague Convention and ICARA,[2] claiming that the father wrongfully had retained the child in the United States on September 12, 2011. After conducting a bench trial, during which the district judge interviewed the child in camera,[3] the court concluded that the child's "habitual residence" in September 2011 was the United States. Accordingly, the court held that the father had not wrongfully retained the child in the United States, and denied the mother's request that the child be returned to Venezuela. After the court denied the mother's motion for reconsideration, the mother filed a timely appeal.

## II.

The Hague Convention is intended "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."[4]

---

[2] The mother filed an amended petition in March 2012.

[3] The child testified that he regards himself as American and would prefer to remain in the United States.

[4] Congress implemented the Hague Convention by enacting ICARA, under which a party may petition a state court or federal district court for return of a child. To prevail, a petitioner must establish by a preponderance of the evidence "that the (Continued)

<u>Maxwell v. Maxwell</u>, 588 F.3d 245, 250 (4th Cir. 2009) (quoting the Hague Convention). To establish a prima facie case of wrongful retention under the Hague Convention, the mother was required to show that:

> a) [the retention was] in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3. The mother therefore was required to prove that (1) the child was "habitually resident" in Venezuela on September 12, 2011, the date of the allegedly wrongful retention; (2) the retention was in breach of the mother's custody rights under Venezuelan law; and (3) the mother had been exercising her custody rights at the time of the retention. <u>Miller v. Miller</u>, 240 F.3d 392, 398 (4th Cir. 2001).

Before turning to the merits of the mother's appeal, we first clarify the standard of review applicable to wrongful retention claims asserted under the Hague Convention. As a general matter, we review the district court's findings of fact

---

child has been wrongfully removed or retained within the meaning of the [Hague] Convention." 42 U.S.C. § 11603; <u>see also</u> <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1250 (11th Cir. 2004).

7

for clear error, and consider de novo the court's conclusions concerning principles of domestic, foreign, and international law.  Miller, 240 F.3d at 399.  We have explained that the task of evaluating a child's place of habitual residence is a "fact specific inquiry that should be made on a case-by-case basis." Id. at 400; see also Elisa Pérez-Vera, Explanatory Report P 66, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 445 (1982), available at http://www.hcch.net/upload/expl28.pdf (explaining that "habitual residence" is a "well-established concept in the Hague Conference, which regards it as a question of pure fact"). Under our clear error standard, we will not reverse a district court's fact-based findings unless we are "left with a definite and firm conviction that a mistake has been committed."  Helton v. AT&T Inc., 709 F.3d 343, 350 (4th Cir. 2013) (citation omitted).

Because the Hague Convention does not define "habitual residence," we have implemented a two-part conceptual framework to guide district courts in their fact-finding role.  Under this framework, district courts are directed to consider two factual questions: (1) "whether the parents shared a settled intention to abandon the former country of residence" (parental intent); and (2) "whether there was an actual change in geography coupled with the passage of an appreciable period of time . . .

8

sufficient for acclimatization by the children to the new environment" (acclimatization). Maxwell, 588 F.3d at 251 (citation and internal quotation marks omitted). As with other factual matters, we review for clear error a district court's findings of fact addressing these issues of parental intent, acclimatization, and habitual residence. See id. at 251, 253.

The mother, however, urges us to depart from clear error review and to consider de novo the district court's ultimate determination regarding the child's habitual residence, arguing that "habitual residence" is a legal term rather than a fact-bound conclusion. We disagree with the mother's argument.

In Maxwell, we explicitly stated that we were required to consider the question whether the district court's decision that the children's "habitual residence was the United States at the time they were removed . . . [was] clearly erroneous." Id. at 251 (emphasis added). Although we have provided district courts with a conceptual focus for determining a child's habitual residence by directing courts to consider parental intent and acclimatization, this conceptual focus does not transform the factual inquiry into a legal one. Rather, in reaching a conclusion regarding the habitual residence of a child, district courts generally begin by making a series of subsidiary factual findings, such as the parents' employment and citizenship status, which ultimately shape the resulting factual finding of

9

habitual residence. Thus, in accordance with our holding in Maxwell, we review for clear error the district court's determination regarding the "habitual residence" of the parties' child.

III.

In the present case, based on the evidence introduced at trial, the district court made extensive findings of fact supporting its habitual residence determination. The court found that the parents "had a shared intention for the child[] to reside in the United States" during the period between 2006 and 2008, in which the child lived with the father and attended school in South Carolina. The court therefore concluded that the child began habitually residing in the United States in 2006.

The court also found that the child's habitual residence did not shift from the United States to Venezuela between 2006 and September 2011, despite the child's frequent travel between the countries in the three-year period from 2008 to 2011. The court explained that, although the mother may have intended that the child resume residence with her in Venezuela during that period, the father did not share that intent. The court further concluded that "the child[] [was] not acclimatized to either country such that removing [him] would take [him] out of the

10

family and social environment in which [his life] had developed," given that his constant travel between the countries had made him "comfortable in either environment." Accordingly, the district court found that the child had habitually resided in the United States since 2006.

On appeal, we focus on the mother's argument that the district court erred in finding that the parents ever shared an intent to abandon Venezuela as the child's place of habitual residence. In support of her contention, the mother challenges the consideration and weight that the district court gave to certain matters in evidence, including the parents' citizenship and immigration statuses, and the fact that the child attended school in South Carolina between 2006 and 2008.[5] We disagree with the mother's argument.

When parents dispute a child's place of habitual residence, "the representations of the parties cannot be accepted at face value, and courts must determine habitual residence from all available evidence." Maxwell, 588 F.3d at 252 (citation and brackets omitted). Evidence of parental intent may include:

_____

[5] The mother does not challenge the district court's finding that the child was "not acclimatized to either country." However, she argues on appeal that she prevailed on the acclimatization prong of the district court's analysis. In any event, upon our review of the record, we conclude that the district court did not clearly err in its acclimatization finding.

11

parental employment in the new country of residence; the purchase and sale of homes in the two countries; marital stability; the retention of close ties to the former country; the storage and shipment of family belongings; the citizenship status of the family members; and the stability of the home environment in the new country. Id.

In the present case, the evidence supports the district court's conclusion that the parents shared an intent in 2006 to shift the child's habitual residence from Venezuela to the United States. The mother testified that "between 2006 and 2008 . . . [the father] and the children were living in Lexington, South Carolina," and explained that "physically the children resided" in South Carolina. As the district court noted, by the 2006-2007 academic year, all of the children attended school in South Carolina and participated in associated extracurricular activities. During this period, while the father remained in South Carolina with the children, the mother commuted between Venezuela and the United States, as often as every weekend.

In 2006, the parents also mutually agreed to begin designing, constructing, and furnishing their large, customized home in South Carolina. They both signed the construction loan application and note, and they represented to the bank providing the loan that the house would be their "primary residence." During the same period, the mother also stated that she was

12

considering obtaining the necessary certification to allow her to transfer her law practice from Venezuela to a city in the United States, such as Charlotte, North Carolina or Atlanta, Georgia. The father and the child began living in the house in the summer of 2008.

The parents' respective citizenship and immigration statuses further indicate that they shared an intent to move the family to the United States in 2006. The mother became a permanent resident of the United States in 2003, and retained her green card through 2013. In contrast, the father's Venezuelan resident visa expired in 2003 and was not renewed, with the result that he traveled to Venezuela as a tourist and was required to limit each visit to a maximum of 90 days.

Ample evidence also supports the district court's conclusion that the child's habitual residence did not shift back to Venezuela during the period from 2008 to 2011. Despite the increased frequency of his travel to Venezuela, the child still spent substantial periods of time in South Carolina. And, significantly, the father managed the child's home schooling lessons in accordance with requirements imposed by the state of South Carolina. The child's program was administered under the supervision of SCAIHS, a South Carolina entity, which never received any information from either parent indicating a relocation of the child to Venezuela.

13

Additionally, during this period, the father and child lived in the South Carolina house while they were in the United States, and the parents continued to purchase expensive furnishings for that residence. The mother also made efforts to acquire a condominium for her mother near the parties' house in South Carolina, and expressed an interest in purchasing nearby properties for the children as well.

Despite these substantial facts favoring the United States as the child's place of habitual residence, the district court also observed that the record contained evidence illustrating the family's ongoing ties to Venezuela, namely, the mother's continued employment in Caracas and the fact that the child completed most of his home school lessons in Venezuela. Indeed, as the district court recognized, the child had a "full and active" life in both locations, which included musical, educational, athletic, social, and religious pursuits. He also enjoyed safe and spacious living accommodations in both countries, and spent significant periods of time in both countries throughout his life. Nevertheless, the district court concluded that the balance of the evidence favored the United States as the place of the child's habitual residence.

In view of this competing evidence adduced at trial, we are not "left with a definite and firm conviction that a mistake has been committed" regarding the district court's habitual

14

residence finding, and we decline to undermine the district court's fact-finding authority by re-weighing the evidence on appeal. Helton, 709 F.3d at 350. The district court rendered a well-reasoned opinion that plainly is supported by extensive evidence in the record. Accordingly, we conclude that the district court did not clearly err in finding that the child habitually resided in the United States from 2006 through September 2011.

IV.

In sum, the district court did not clearly err in its determination regarding the child's habitual residence,[6] and therefore correctly concluded that the mother failed to meet her burden of proving her wrongful retention claim under the Hague Convention and ICARA. Accordingly, we affirm the district court's judgment.

AFFIRMED

---

[6] Because we affirm the district court's habitual residence determination, we do not address the father's alternative arguments, namely, his contention that the mother failed to prove the other elements of her prima facie case, and the father's affirmative defense that the child objected to being returned to Venezuela.

15