# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-20154

United States Court of Appeals
Fifth Circuit

**FILED**

July 25, 2017

Lyle W. Cayce
Clerk

SEBASTIAN C. CARTES,

　　　　Plaintiff - Appellee

v.

LISA ELLEN PHILLIPS,

　　　　Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, GRAVES, and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

"The Hague Convention on the Civil Aspects of International Child Abduction generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, 568 U.S. 165, 168 (2013). In this case, Sebastian Cartes, the father of a three-year-old girl, O.C.P., petitioned the Southern District of Texas to order Lisa Phillips, O.C.P.'s mother and Cartes's wife, to return O.C.P. to Paraguay, where she had lived with both Cartes and Phillips from October 2015 to October 2016. After a three-day bench trial, the district court determined that Paraguay was O.C.P.'s "habitual residence" and that Phillips

No. 17-20154

had wrongfully removed her to the United States on October 24, 2016. Phillips appealed, arguing that the district court applied the wrong legal standard when assessing the parties' shared intent about O.C.P.'s habitual residence, factually erred by finding that O.C.P. habitually resided in Paraguay before October 2016, and incorrectly excluded certain evidence of Cartes's communications with real estate agents in the United States. We affirm.

**I**

Sebastian Cartes, a U.S. citizen who grew up in Paraguay, and Lisa Phillips, a U.S. citizen, met in California in 2012 and married there in February 2013. Their daughter, O.C.P., was born in California on September 23, 2013. Cartes and Phillips's marriage was marked by drug use (Cartes's), sickness (O.C.P.'s), and frequent travel and relocation. The record suggests that neither Cartes nor Phillips had a job; they relied almost exclusively on Cartes's mother Sarah, the sister of Paraguay's current president, to pay their expenses.

One month after O.C.P. was born, the family moved to Houston, where Phillips's parents live. The family lived there for about two years, but was rarely settled. When Cartes wasn't in rehab, the family lived together until September 2014, when Phillips and O.C.P. moved out and separately rented an apartment. The family also frequently traveled to California, Paraguay, and elsewhere. From June through September 2015, Cartes and Phillips looked for apartments to rent in California. According to Phillips, she wanted to move to California to live there long-term; according to Cartes, they wanted an apartment in California only for visiting.

Cartes testified that sometime in the spring of 2015, he moved to Paraguay without Phillips and O.C.P. to live there more permanently. Cartes hadn't moved all of his belongings, so he returned to the United States in early September to collect the rest of his things. At this time, he and Phillips talked

2

about divorce. Cartes consulted with two divorce lawyers and sent Phillips an email telling her that he was leaving for Paraguay without her. At the district court's bench trial, Cartes admitted that "at that time what was going through [his] mind [wa]s . . . going back to Paraguay and ending [their] marriage." He "wasn't thinking at the time of . . . [his] wife and child -- or where they would live."

A month later, on October 18, 2015, Phillips and O.C.P. flew to Paraguay. According to Cartes, before Phillips and O.C.P. arrived in Paraguay, he and Phillips "had several conversations about the possibility of going to live in Paraguay [for] employment, the financial future of [their] family, [and] the fact that [they] would have assistance with [their] daughter [from] nannies, parents and so on." According to Phillips, however, she and O.C.P. weren't moving to Paraguay. Rather, they wanted to be there when Phillips's sister-in-law gave birth to Phillips's nephew (O.C.P.'s cousin). Before leaving Houston, Phillips renewed the lease for her apartment.

While in Paraguay, Phillips and O.C.P. traveled back to the United States at least twice. O.C.P. continued to have American health insurance and saw doctors in the United States. Similarly, Phillips maintained American health insurance for herself and Cartes. She also kept a car in Houston and paid her car insurance regularly while she was in Paraguay. But Cartes testified that he and Phillips also decided to develop O.C.P.'s connection to Paraguay. For example, the two decided that O.C.P. would attend a Paraguayan preschool, and school records reflect that she regularly attended.

Cartes also testified that although he and Phillips fought frequently, they "always intend[ed] to reconcile." Specifically, Cartes said he and Phillips reconciled around "June, July, [and] August" of 2016. Text conversations support this. For example, on August 4, Cartes told Phillips that he was "focused on the long term" with Phillips and didn't "want to do anything . . .

3

that w[ould] be detrimental or c[ould] hurt [their] chances of this working in the future." Cartes also told Phillips he wanted to be on her "team" and to "move forward[.]" Phillips agreed: "That sounds like a perfect plan to me and I would love that to be a goal! I will work with you however I can to achieve that goal[.]"

Cartes testified that "throughout" their conversations about reconciliation, he "expressed [his] desire and . . . opinion that O.C.P. live in Paraguay because it would be most convenient for everyone." According to Cartes, "[Phillips] agreed that she wouldn't be as happy anywhere else and that she would be fine and happy there and that [Paraguay] was also her home." Cartes reiterated that Phillips agreed that Paraguay "would always be" both her and O.C.P.'s "home" or "base." Text messages between Cartes and Phillips illustrate that Phillips indeed described Paraguay as "home." When Phillips was visiting Argentina in August 2016, she repeatedly told Cartes, who was in Paraguay, "I just want to come home."

In September 2016, Phillips officially moved out of her Houston apartment. According to her parents, who moved all of Phillips's belongings, the apartment was fully furnished; it looked as if Phillips and O.C.P. still lived there. Phillips's mom said that Phillips never told any of her family in Houston that she had "moved" to Paraguay.

In October 2016, Phillips decided that she wanted to return to the United States with O.C.P. On October 9, Phillips and Cartes exchanged the following texts:

> Phillips: I definitely overstayed my welcome in P[aragua]y and I know we need to leave. . . . I wouldn't go anywhere without [O.C.P.] and I tried [d]oing it there with you guys but it's just not working and I don't want any problems arising because I don't like your country or your culture.

. . . .

4

No. 17-20154

Cartes:    I don[']t know if you[']ve noticed she is very happy here . . . . [R]emoving her from her whole life just so you can go feel better about yourself [i]s extremely selfish . . . . [Y]ou do this all the time. You[']re unhappy and you run . . . You move . . . You relocate . . . But [I'm] not supportive of you taking her one bit[.]

. . . .

Phillips:    She was born here[.] I am from here, not P[aragua]y[.] You moved to P[aragua]y, not me[.] So, if me being where we are from with her is considered taking here th[e]n I'm sorry[.] I don't know how I am going to do it but I have to try[.] And you want to be in P[aragua]y that's fine but I don't[,] and [O.C.P.] needs to be with me[.] You shouldn't have made that decision on your own[.]

Cartes:    Right [I] shouldn't have[.] Just like you shouldn[']t be the only one making the decision to take her[.]

Phillips:    It's not taking her . . . It's being where we are from and where you met us[.] You being there with her is taking her . . . I am not Paraguayan [a]nd we are not from there[.]

. . . .

Phillips:    [I]t feels [like] you['re] not considering me in your picture . . . [w]hich is why you don't support something that could be so positive for [O.C.P.] . . . And for me obviously . . . That's two out of the 3 of us I see this could be good for and 3 if you want to try to do you over here like I've been doing over there[.]

On October 23, 2016, Phillips decided to leave Paraguay, and she flew back to Houston with O.C.P. the next day, October 24.

On December 1, 2016, Cartes filed a petition for O.C.P.'s return to Paraguay under the Hague Convention on the Civil Aspects of International Child Abduction. The district court held a three-day bench trial, at which it heard testimony from Cartes and Phillips, their families, and others. On March 6, 2017, the district court ruled in favor of Cartes, finding that Paraguay

5

No. 17-20154

was O.C.P.'s habitual residence and that Phillips had wrongfully removed her to the United States.  Phillips timely appealed.

## II

"A district court's determination of a child's 'habitual residence' is a mixed question of law and fact[.]"  *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016) (citing *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012)).  This "mixed" standard means we accept the district court's findings of fact unless they are clearly erroneous, but we "exercis[e] plenary review" of the court's interpretation of the law and application of the law to the facts.  *Id.* (quoting *Berezowsky v. Ojeda*, 765 F.3d 456, 465-66 (5th Cir. 2014)).

Where a child habitually resides "is a fact-intensive determination that necessarily varies with the circumstances of each case."  *Id.* at 578 (quoting *Larbie*, 690 F.3d at 310).  This determination depends on "the parents' shared intent or settled purpose regarding their child's residence. . . . giv[ing] greater weight to the parents' subjective intentions relative to the child's age."  *Id.* (quoting *Larbie*, 690 F.3d at 310).  When the child is too young to decide residency on the child's own, the parents' shared intent "should be dispositive."  *Id.* (quoting *Larbie*, 690 F.3d at 310).  The "threshold" inquiry under our approach is whether "both parents intended for the child to abandon the habitual residence left behind."  *Id.* (alterations omitted) (quoting *Larbie*, 690 F.3d at 310-11).  "Absent the parents' shared intent, prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion."  *Id.* (internal quotations omitted) (quoting *Larbie*, 690 F.3d at 311).

We treat a district court's determination of the parents' shared intent as a factual finding reviewed for clear error.  *Berezowsky*, 765 F.3d at 466 n.7.  We will "affirm the district court's determination that the parents shared an intent to make a particular country their child's habitual residence unless it is

implausible in light of the record as a whole." *Id.* at 466. When reviewing for clear error, we will reverse "only if we have a definite and firm conviction" that the district court made a mistake. *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011). This burden is even heavier if the district court factored witness credibility into its decision. *Id.*

## III

Phillips's primary arguments concern the district court's finding that Paraguay was O.C.P.'s habitual residence in October 2016, when Phillips and O.C.P. returned to Houston.

## A

Phillips first contends that the district court applied the wrong legal standard because the district court did not point to any "explicit meeting of [Cartes's and Phillips's] minds to abandon the United States" as O.C.P.'s habitual residence before they traveled to Paraguay in October 2015. Phillips is correct that the "threshold" inquiry under our approach is whether "both parents intended for the child to abandon the habitual residence left behind." *Berezowsky*, 765 F.3d at 578 (alterations omitted) (quoting *Larbie*, 690 F.3d at 310-11). We are satisfied, however, that the district court did not legally err. The district court quoted circuit authority recognizing abandonment as the threshold inquiry and analyzed the parties' positions in light of these references.

## B

Next, Phillips argues that even if the district court did not legally err, it nonetheless factually erred by finding that Cartes and Phillips jointly intended to make Paraguay O.C.P.'s habitual residence before Phillips and O.C.P. returned to the United States.

The district court's habitual-residence finding that Cartes and Phillips were "determined to make a home for themselves and their minor child" in

Paraguay is not "implausible" and thus not clearly erroneous. *See Berezowsky*, 765 F.3d at 466 & n.7. The record supports Cartes's testimony, on which the district court heavily relied, that despite discord, he and Phillips agreed Paraguay would be O.C.P.'s habitual residence. For example, Cartes said that he and Phillips jointly agreed to send O.C.P. to preschool in Paraguay, evincing their intent to make Paraguay a "more permanent" home for O.C.P. *See id.* at 472 (explaining that courts typically consider "the circumstances of [a] family's move when assessing parental intent"). Not only did Phillips testify that O.C.P.'s attendance was not compulsory, but O.C.P.'s preschool teacher also explained that Phillips visited the school before formally enrolling O.C.P. and occasionally dropped her off or picked her up from school, which indicates Phillips agreed to O.C.P.'s Paraguayan schooling.

Cartes also testified that during certain periods of reconciliation—specifically June, July, and August of 2016—he told Phillips that he wanted O.C.P. to live in Paraguay permanently and that Phillips agreed Paraguay "would always be" home to both her and O.C.P. *See id.* at 468 ("[S]hared parental intent requires . . . the parents [to] reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together."). Text messages between Cartes and Phillips support the district court's decision to credit Cartes's version of events. During one conversation in August 2016, Phillips repeatedly referred to Paraguay as "home." Texts from October 2016, when her relationship with Cartes began to break down, show Phillips describing herself as having "tried" to be a family in Paraguay but ultimately wanting to return to the United States. Phillips asked Cartes to move back to the United States, so that they could try being a family there, like she had been doing in Paraguay, but he refused.

Phillips contends that the district court's shared-intent finding is implausible based on the parties' "history of discord" and "the fact that the

No. 17-20154

parties never reconciled" without acknowledging the evidence described above. Phillips also focuses on negating any inference of shared intent at the time she and O.C.P. first traveled to Paraguay in October 2015. But as the Ninth Circuit has explained (in an opinion this court frequently cites with favor, *see, e.g.*, *id.* at 467-68), parents' shared intent about their child's habitual residence does not—and need not—always coincide with the child's initial change in location. Sometimes, "the family as a unit has manifested a settled purpose to change habitual residence . . . when both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new country." *Mozes v. Mozes*, 239 F.3d 1067, 1076-77 (9th Cir. 2001). In other cases, a parent may have "earlier consented to let the child stay abroad for some period of ambiguous duration[, but] circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely." *Id.* at 1077. Accordingly, we cannot say that the district court's finding of habitual residence is implausible in light of the record as a whole.

## IV

Finally, Phillips argues that the district court erred by excluding evidence of emails between Cartes and various real estate agents in California.[1] Phillips contends the emails tend to show that she and Cartes never intended to abandon the United States as O.C.P.'s habitual residence before traveling to Paraguay. The district court excluded these emails as "irrelevant" because Phillips never actually moved to California; in the district

---

[1] Phillips also argues that the district court erred in excluding evidence of her plans to have surgery in November 2015, but the trial transcript reflects that the district court in fact admitted this evidence, but interjected when counsel sought to elicit specific details about the nature and type of surgery. We see no error in the district court's excluding as irrelevant this particular information.

court's view, an unfulfilled plan was not the "best evidence [of the parties'] intentions."

"We review evidentiary rulings under a deferential abuse-of-discretion standard." *Aranasas Project v. Shaw*, 775 F.3d 641, 655 (5th Cir. 2014) (per curiam). Evidentiary rulings are also subject to harmless error analysis. *Id.*

As explained in Part II, our approach to determining a child's habitual residence is a subjective test requiring district courts to ascertain "parents' intent or settled purpose" about their child's home. *Delgado*, 837 F.3d at 578 (quoting *Larbie*, 690 F.3d at 310). With typical Convention cases between estranged spouses, we have encouraged courts to consider not only the parties' testimony, but also, more generally, "all available evidence." *Berezowsky*, 765 F.3d at 471 (quoting *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009)). Because the threshold for relevance is "low," *Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 809 (5th Cir. 2017), documentary evidence tending to corroborate testimony about the parties' shared intent is likely to be relevant in most Convention cases.

But any error in this case is harmless. The excluded evidence shows Cartes communicating with real estate agents in California. Cartes tells the agents that he and Phillips are "interested" in renting certain apartments and asks about room sizes and views from the units. In none of the emails does Cartes explain precisely why he and Phillips are looking for an apartment in California, so none of the emails addresses the critical dispute in this case— whether the parties intended for the United States or Paraguay to be O.C.P.'s habitual residence. On that point, the district court had to consider the parties' testimony in light of the other evidence in the record, and both Cartes and Phillips testified consistently with the information conveyed in the emails. Phillips said they wanted to rent an apartment in California so she could live there long-term with O.C.P. Cartes admitted to looking for apartments in

No. 17-20154

California, but said any apartment was simply for the family to have a place to stay when they visited. Without any documented reason for the parties' wanting an apartment, the excluded evidence does not undermine Cartes's testimony about their plans for California, and the district court was free to credit his explanation. Accordingly, any error in excluding this evidence is harmless.

## V

The district court did not legally err in assessing the parties' shared intent about their child's habitual residence. Nor is the district court's factual finding that they agreed O.C.P. would habitually reside in Paraguay clearly erroneous. And because any purported evidentiary error does not bear on the crux of this dispute and is thus harmless, we AFFIRM the judgment of the district court.