# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20039

United States Court of Appeals
Fifth Circuit

**FILED**

August 26, 2014

Lyle W. Cayce
Clerk

MICHELLE GOMEZ BEREZOWSKY,

Plaintiff – Appellee,

v.

PABLO ANGEL RENDON OJEDA,

Defendant – Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case arises out of a child custody dispute. Michelle Gomez Berezowsky filed a petition under the Hague Convention, asserting that Pablo Angel Rendon Ojeda had wrongfully removed their child, PARB,[1] from Mexico to Texas. The district court granted Berezowsky's petition and ordered that PARB be returned to Mexico. Because Berezowsky failed to meet her burden of establishing that Mexico was PARB's place of habitual residence, we VACATE the district court's order and REMAND with instructions to dismiss.

---

[1] In order to protect his privacy, we refer to the child by the initials used by the district court and the parties. *See, e.g.*, *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1229 n.1 (2014); *Abbott v. Abbott*, 560 U.S. 1, 5 (2010).

No. 13-20039

## I.

Berezowsky and Rendon are both Mexican nationals. They met in Mexico City in May or June of 2008. In September 2008, Berezowsky learned that she was pregnant and she and Rendon became engaged. By March 2009, their relationship had deteriorated to the point that Berezowsky moved to her parents' home in Kingwood, Texas, and cut off communication with Rendon. During this time Berezowsky attended Lonestar Community College in Texas. Berezowsky was living in the United States on a student visa, and she later testified that she intended to raise PARB in the United States if she was able to obtain a work visa after completing school. Her parents began the process of transferring or conveying their house in Texas to her. According to Berezowsky, they never finalized the conveyance. Rendon made repeated attempts to gain information about his unborn child during Berezowsky's pregnancy. He received no response. Berezowsky gave birth to PARB on May 31, 2009, in Kingwood, Texas. Approximately one month after PARB was born, Rendon learned his child's name, sex, and date of birth through a private investigator.

The legal proceedings that followed PARB's birth have been convoluted to say the least. PARB is now five years old. In his short time on this Earth, PARB has changed hands, and countries, many times. By our count at least 12 different courts—including our own—have been implicated in this near-constant custody dispute. In order to give a sense of how contentious the parents' court battles have been, we will summarize the proceedings, which have spanned multiple years and both sides of the border. Indeed, the parents have been involved in almost continuous proceedings—sometimes litigating in several courts simultaneously—since PARB's birth. More often than not, the two parents seem to be fighting out this battle in completely separate courts

2

No. 13-20039

from one another.  Both parties have obtained orders by default, which the other party has subsequently appealed.

The fight began in Mexico, but quickly moved to Texas.  Rendon first filed a criminal complaint against Berezowsky in Mexico alleging that he feared that PARB was being neglected and that Berezowsky had hidden information from him related to PARB.  Through the accompanying investigation, he obtained a copy of PARB's Mexican and Texas birth certificates.  After discovering that PARB's birth certificates did not list a father, Rendon filed a suit in Mexico City in December 2009 to establish his paternity.  The case was assigned to the 24th Family Court in Mexico (24th Mexican Court).  According to Rendon, he was unable to personally serve Berezowsky in this Mexican suit, because she was in Texas, and instead served her through publication.  The suit was dismissed without prejudice.

In February 2010, Rendon moved the custody dispute to the 410th District Court of Montgomery County, Texas (410th District Court of Texas), where Berezowsky and PARB were living at the time.  The parents litigated PARB's custody in the Texas state court system for the next two years while PARB continued to live in Texas with his mother.  In response to Rendon's suit to adjudicate parentage and a suit affecting parent-child relationship in the 410th District Court of Texas, Berezowsky filed an answer and a counter-petition, seeking to be appointed PARB's sole managing conservator.  Rendon then non-suited his petition in the 410th District Court of Texas, challenged the 410th District Court of Texas's jurisdiction, and filed a petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention), seeking to have PARB sent to Mexico.  The 410th District Court of Texas denied Rendon's Hague Convention petition, and concluded that it had jurisdiction.

3

No. 13-20039

Rendon filed a writ of mandamus, which he appealed all the way to the Texas Supreme Court. As the 410th District Court of Texas later explained, Berezowsky "strenuously asserted residence and jurisdiction over the child in Texas and in [the 410th District Court of Texas]." According to the 410th District Court of Texas, Berezowsky

> insisted that the determination of the custody of the child be made in [the 410th District Court of Texas], in Texas, and not in Mexico; and submitted briefs to [the 410th District Court of Texas], the appellate court, and the Supreme Court of Texas, arguing in favor of a finding of jurisdiction to determine the custody of the child in Texas. Both the appellate court, and the Supreme Court of Texas found that jurisdiction to determine the custody of the PARB was and is proper in [the 410th District Court of Texas.]

More than a year later, Berezowsky and Rendon finally agreed to stipulate that Rendon was PARB's biological father. A jury trial was then held in the 410th District Court of Texas. Both parents were present and represented by counsel. In August 2011, the jury rendered a unanimous verdict, awarding primary custody to Rendon. The 410th District Court of Texas entered an order awarding Rendon and Berezowsky joint parental rights, and giving Rendon the right to determine PARB's residence (Texas Order).

The Texas Order limited PARB's primary residence to three geographic areas in Mexico "until further order of the court of continuing jurisdiction or agreement of the parties." It also required each parent to give notice to the other before traveling with PARB outside of Mexico. The Texas Order gave Berezowsky standard visitation rights and ordered her to pay child support. It further required the parties to cooperate with each other and take any and all actions necessary for the child's name to be changed in the Mexican birth

4

records, and to ensure that Rendon be named as the biological and legal father of PARB in Mexican birth records.[2]

Berezowsky filed a motion for a new trial and a motion for judgment notwithstanding the verdict.  Both were denied.  In September 2011, Berezowsky appealed the case to the 9th Court of Appeals in Beaumont, Texas (Texas 9th Court of Appeals).  Berezowsky argued on appeal that while the 410th District Court of Texas correctly found that Texas was PARB's home state and that it had jurisdiction over the custody suit, its exercise of that jurisdiction was improper because the suit in the 24th Mexican Court was filed first.  The Texas 9th Court of Appeals affirmed the jurisdiction and judgment of the 410th District Court of Texas.  *See In the Interest of A.B.G.*, No. 09-11-00545, 2013 WL 257311 (Tex. App.–Beaumont, Jan. 24, 2013) (unpublished).

Pursuant to the Texas Court Order, Rendon drove across the border with PARB to Cuernavaca, Mexico, in October 2011.  Rendon notified the 410th District Court of Texas that he had no intention of returning to Montgomery County, where the 410th District Court of Texas was located.  According to Berezowsky, she did not find out that Rendon had left the country with PARB until after the father and son had already reached Mexico.  Berezowsky moved to Mexico City on October 18, 2011, and then moved to Cuernavaca two weeks later.  Berezowsky filed a notice of change of address, "[b]ecause my son was living in Cuernavaca."  She moved into the home of a friend "until I found somewhere to live."  Meanwhile, Berezowsky's appeal was still pending before the Texas 9th Court of Appeals.

---

[2] Despite this order, Berezowsky failed to have PARB's birth certificate amended to reflect that Rendon is his father.  According to Rendon, Berezowsky asked the 410th District Court of Texas to seal the results of Rendon's paternity test and not to publish the results to any court in Mexico, but the court refused to do so.

No. 13-20039

Once in Mexico, the parents spared little time before renewing their legal battles. Within the thirteen-month timespan that PARB lived in Mexico, his parents filed or continued actions in seven Mexican courts, and continued to litigate matters in Texas. Just weeks after her arrival, Berezowsky filed a suit to terminate Rendon's parental rights in Cuernavaca, in the State of Morelos (7th Mexican Court). In her initial complaint, Berezowsky made a number of accusations against Rendon, ranging from claims that he had harassed her in the past, to allegations that he was serving her son "foods that are not nutritious and that are high in sugar, such as pizza, 'cokes', ice cream and juices." She also heavily emphasized a public policy in Mexico that gives preference to the mother in custody determinations for "children of a tender age." Berezowsky argued that it was therefore in PARB's best interest for her to take care of him.

The 7th Mexican Court granted Berezowsky temporary custody of PARB, only allowed Rendon one hour of weekly supervised visits with PARB, and required Rendon to pay child support. In her complaint Berezowsky had requested that the suit be kept secret until Rendon received a summons. Rendon reports that he did not learn that Berezowsky had filed this suit until December 16, 2011. Rendon then filed an appeal to the appellate court in the State of Morelos (Morelos Auxiliary Chamber), arguing that the 7th Mexican Court lacked jurisdiction to make this ruling.

While that appeal was pending in the Morelos Auxiliary Chamber, Rendon sought relief from the 410th District Court of Texas. In December 2011, Rendon filed a motion to enforce the Texas Order, which had given him custody of PARB just months before. In January 2012, Rendon filed an amended motion to enforce and to clarify the Texas Order with a request for a writ of habeas corpus, a petition to modify the Texas Order, and a suit for interference

6

of child custody. Berezowsky did not file an appearance or a response, and later argued that she was never properly served.

On January 12, 2012, the 410th District Court of Texas found that Berezowsky was in violation of the possession and access, as well as the passport provisions of the Texas Order, and had wrongfully withheld PARB from Rendon for a period of time greater than one month (Second Texas Order). The 410th District Court of Texas noted that Berezowsky had "claimed to the courts of Morelos[, Mexico,] that the child was abducted from Texas by his father" and then concluded that Rendon was in compliance with the Texas Order, had not abducted PARB from the United States, and had a superior right to possess PARB. The 410th District Court of Texas issued a writ of habeas corpus commanding Berezowsky and her parents to immediately and safely deliver PARB to the 410th District Court of Texas, and to personally appear to show cause and defend against the motion filed by Rendon. Berezowsky did not do so.

The 410th District Court of Texas also issued a temporary restraining order, prohibiting Berezowsky from interfering with Rendon's right to possess PARB, hiding or secreting PARB, disturbing the peace of PARB, and making disparaging remarks regarding Rendon or his family within the presence or hearing of PARB. The 410th District Court of Texas suspended Berezowsky's rights to possession of, and access to, PARB pending a further order from that court. A hearing was set for February 9, 2012, to determine if the temporary restraining order should be made a temporary injunction. This temporary restraining order was served on Berezowsky outside of the 7th Mexican Court by hand delivery on February 17, 2012, along with a petition for damages from interference with possessory rights and a petition to modify the parent-child relationship, and an order setting a hearing on the temporary orders. The

No. 13-20039

410th District Court of Texas also ordered Berezowsky to submit to regular counseling by a licensed therapist.

On the same day, the 410th District Court of Texas also signed an order clarifying that Berezowsky and her parents were misrepresenting the Texas Order "to the courts of Morelos or the United Mexican States." The 410th District Court of Texas explained that the Texas Order "is a valid, existing, final and enforceable order, and the matter of the primary custody of the child PARB is res judicata." In addition, the 410th District Court of Texas clarified that unless and until an appellate court reversed the Texas Order, that it would remain both final and enforceable.

The 410th District Court of Texas held the hearing on these temporary orders on February 23, 2012. Despite receiving notice by hand delivery, Berezowsky did not appear. The 410th District Court of Texas then appointed Rendon PARB's sole managing conservator. The 410th District Court of Texas gave Rendon sole custody and the exclusive right to designate PARB's primary residence with no geographic restrictions. Berezowsky was appointed possessory conservator with only the right to receive information from Rendon regarding PARB's health, education, and welfare. Berezowsky was given supervised visits with PARB on the first, third, and fifth Saturdays of each month for four hours at the Access Builds Children Supervising Agency in Montgomery County, Texas. Despite this order, Berezowsky continued to maintain possession of PARB in Mexico. In August 2012, she moved from Cuernavaca to Mexico City.

Meanwhile, Rendon's challenge to the jurisdiction of the 7th Mexican Court, which had granted Berezowsky temporary custody was still pending before the Morelos Auxiliary Chamber. On August 16, 2012, the Morelos Auxiliary Chamber determined that the 7th Mexican Court did not have

8

jurisdiction, rendering any ruling by that court null and void.  The Morelos Auxiliary Chamber forwarded Berezowsky's suit to the 24th Mexican Court in Mexico City where Rendon had initially filed his suit to establish paternity in 2009. Berezowsky, who was still in possession of PARB, sought custody of PARB from the 24th Mexican Court.  On August 27, 2012, the 24th Mexican Court refused to accept Rendon's acknowledgment of paternity because PARB's Mexican records were registered only by Berezowsky, and because there had been no final or definitive judgment as to his paternity in Mexico. The 24th Mexican Court awarded Berezowsky exclusive parental rights and rights of possession of PARB.

Rendon challenged the jurisdiction of the 24th Mexican Court to enter findings and filed a motion to dismiss his 2009 petition for acknowledgment of paternity.  In September 2012, Rendon filed an action in the 11th Court in Mexico City seeking to enforce Texas Orders (11th Mexican Court).  Whether by accident or design, this suit was filed with the wrong heading or caption and misnamed the parties.  On September 18, 2012, the 11th Mexican Court recognized and enforced the Texas Orders and ordered Berezowsky to immediately surrender PARB to Rendon.

On October 11, 2012, Rendon arrived at PARB's school with a group of men just as PARB was being released to go home.  According to Rendon, this group consisted of the Secretary of the 11th Mexican Court and police officers sent to enforce the 11th Mexican Court's order.  A member of this group restrained Berezowsky, who was waiting in carpool line, and served her with

9

notice of the law suit in the 11th Mexican Court.[3]  Meanwhile, Rendon left with PARB.

The following day Berezowsky reported to the 24th Mexican Court that Rendon had abducted PARB.  The 24th Mexican Court issued an order to search and locate PARB, and ordered the parties to appear with PARB on October 18, 2012, or else face arrest.  Rendon did not appear on October 18 as ordered, and the 24th Mexican Court issued a warrant for his arrest.  In response, Rendon filed an *amparo* (federal constitutional challenge) in the 4th Civil District Court in Mexico (4th Mexican Court) to stay the 24th Mexican Court's orders on October 25, 2012.  The 4th Mexican Court suspended the 24th Mexican Court's orders for DNA testing and the arrest warrant for Rendon pending the appeal, but all other orders remained in effect.

On November 1, 2012, Rendon drove across the border and entered Texas with PARB.  On November 6, 2012, the 24th Mexican Court ordered that the proceedings in the 11th Mexican Court be consolidated with the case in the 24th Mexican Court.  The 24th Mexican Court then revoked or nullified the orders of the 11th Mexican Court, which had given Rendon custody.  The 24th Mexican Court explained that the only matter before the 24th Mexican Court was a petition to acknowledge paternity, and since there was no legal father, the 24th Mexican Court could not make a custody determination.  The 24th Mexican Court reaffirmed that Berezowsky had exclusive rights to, and custody of, PARB.

---

[3] That same day Rendon apparently also filed an action in the 10th Family Court in the Federal District of Mexico (10th Mexican Court).  The record is unclear what the purpose of this suit was, and Berezowsky reports that she was never served with any pleading regarding this suit.

No. 13-20039

On November 7, 2012, Rendon filed an application for a protective order in the 410th District Court of Texas. The 410th District Court of Texas ordered both parties to appear on December 6, 2012.

On November 15, 2012, Rendon appealed the 24th Mexican Court's orders, including: (1) the 24th Mexican Court's order refusing to dismiss his petition; (2) the order revoking the 11th Mexican Court's orders; (3) the order granting possession to Berezowsky; (4) the order for DNA testing; (5) the arrest warrant; and (6) the immigration alert to the 5th Chamber of the Federal District of Mexico (5th Mexican Court). The 5th Mexican Court accepted Rendon's appeals, but refused to stay any of the 24th Mexican Court's prior orders.

On November 30, 2012, Berezowsky filed a petition in the United States District Court for the Southern District of Texas (Southern District Court) under the Hague Convention. In January 2013, the Southern District Court issued an order holding that PARB had been wrongfully removed from Mexico and ordered his immediate return. The order awarded attorney's fees and costs to Berezowsky. Rendon then filed a notice of appeal to this court. On appeal, Rendon contends that the district court erred in holding that: (1) Mexico was PARB's habitual residence; (2) Rendon wrongfully removed PARB from Mexico; and (3) Berezowsky had not consented to PARB's removal by consenting to the jurisdiction of the 410th District Court of Texas. In their appeal before this court, the parties have filed supplemental briefs, a motion to dismiss the appeal and responses,[4] and eight different letters of

---

[4] Berezowsky contends that this case before our court was rendered moot because the Federal District of Mexico issued an arrest warrant for Rendon on April 30, 2014, for transporting PARB outside of Mexico. As a condition of Rendon's release, Berezowsky reports that Rendon is prohibited from leaving the Mexican court's jurisdiction without permission. Berezowsky argues that this makes it "practically impossible" to order PARB's return to the

supplemental authority under Federal Rule of Appellate Procedure 28(j). Both parties contend that the other has made numerous misrepresentations to the various courts along the way.

## II.

The Hague Convention was adopted to address the problem of international child abductions during domestic disputes. *Lozano*, 134 S. Ct. at 1228 (citing *Abbott*, 560 U. S. at 8). Specifically, the Convention is aimed at preventing parents from engaging in international forum shopping and gamesmanship by moving a child to a new country in hopes of obtaining a more favorable custody determination from a different court. *See Abbott*, 560 U.S. at 20 (noting the "Convention's purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes"); *Larbie*, 690 F.3d at 310 (noting that the Convention was designed "to deter parents from engaging in international forum shopping in custody cases"). This case presents a textbook example of parents engaged in international forum-shopping. Although Berezowsky comes before this court seeking relief under the Hague Convention, the procedural history in this case

---

United States, and therefore prevents us from granting relief on appeal. Both Supreme Court precedent and our own case law makes clear that these events do not moot this case. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1025 (2013); *Larbie v. Larbie,* 690 F.3d 295, 305–06 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1455 (2013).

In *Larbie* we noted that the case was not moot because our decision might impact the appellant-father's liability for the mother's fees and costs, which she requested below. *Id.* at 306. Likewise, the district court here awarded attorney's fees and costs to Berezowsky, and a decision by this court could impact Rendon's liability for such costs.

Furthermore, the fact that Mexico may not enforce a decision of this court does not moot the case. If Berezowsky and PARB return to the United States, then a decision by this court could be enforced against her. *See Chafin*, 133 S. Ct. at 1025 ("But even if Scotland were to ignore a U.S. re-return order, or decline to assist in enforcing it, this case would not be moot. The U.S. courts continue to have personal jurisdiction over Ms. Chafin, may command her to take action even outside the United States, and may back up any such command with sanctions.").

demonstrates the extent to which she has ignored court orders and sought "friendlier forums" to adjudicate this dispute.

One of the Convention's primary objectives is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."[5]  *Id.* at 306 (citing Convention art. 1).  In other words, a parent should not be able to evade the order of one court simply because he or she has moved the child into another court's jurisdiction. When evaluating a Hague Convention claim, we do not assess the merits of the underlying custody dispute.  Rather, our inquiry is limited to determining whether or not the child has been wrongfully removed from their country of "habitual residence."  *See Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (citing 42 U.S.C. § 11601(b)(4)); *see also Barzilay v. Barzilay*, 600 F.3d 912, 916–17 (8th Cir. 2010).  Simply put, the narrow question before us is whether Rendon wrongfully removed PARB from his country of habitual residence by bringing him back to Texas.  Because Berezowsky filed this action under the Hague Convention, she must demonstrate by a preponderance of the evidence that Mexico was PARB's habitual residence in order to establish her claim that PARB was wrongfully removed.  *See Larbie,* 690 F.3d at 310.[6]

The district court's habitual residence determination presents a mixed question of law and fact subject to *de novo* review.  *Id.* at 306.  The mixed standard of review "means that the court 'accept[s] the district court's

---

[5] Both Mexico and the United States are Contracting States.

[6] A removal or retention is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention;" and (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Larbie*, 690 F.3d at 307 (citing Hague Convention art. 3).

historical or narrative facts unless they are clearly erroneous, but exercis[es] plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts.'" *Ruiz*, 392 F.3d at 1251 (citations omitted).    "After scrutinizing the circumstances of a particular case, we must determine whether the discrete facts add up to a showing of habitual residence." *In re B. Del C.S.B.,* 559 F.3d 999, 1008 (9th Cir. 2009) (quoting an *Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004)).

> [A]lthough the term "habitual residence" appears throughout the various Hague Conventions, none of them defines it.  The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case.  At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a Convention petition.

*Larbie,* 690 F.3d at 310 (internal quotation marks and citations omitted); *see also Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004) ("[C]ourts must consider the unique circumstances of each case when inquiring into a child's habitual residence.").

"Courts use varying approaches to determine a child's habitual residence, each placing different emphasis on the weight given to the parents' intentions." *Larbie*, 690 F.3d at 310.  Like the majority of circuits, we have "adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id.* (citing *Nicolson v. Pappalardo*, 605 F.3d 100, n.2 (1st Cir. 2010)).  "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age.  For example, parents' intentions should be dispositive where, as here, the child is so young that he or she cannot

14

possibly decide the issue of residency." *Id.* at 310 (internal citations and quotation marks omitted).

> In such cases, the threshold test is whether both parents intended for the child to abandon the [habitual residence] left behind. Absent shared intent, prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion. Notably, when the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] . . . most courts will find no change in habitual residence. Mere retention in another country and "private reservations" or intentions that are made "manifest and definitive" only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence.

*Id.* at 310–11 (internal quotations and citations omitted). We affirm the district court's determination that the parents shared an intent to make a particular country their child's habitual residence unless it is implausible in light of the record as a whole. *See Larbie*, 690 F.3d at 306 ("A factual finding survives review so long as it is plausible in the light of the record as a whole." (citation and internal quotation marks omitted)).[7]

---

[7] In reaching this conclusion, we join our sister circuits in treating the shared intent determination as a factual finding that is reviewed for clear error. *See, e.g.*, *Darin v. Olivero–Huffman*, 746 F.3d 1, 9 (1st Cir. 2014) (holding that within the habitual residence inquiry, "determinations of intent involve questions of fact and we will defer to the district court's findings on intent unless they are clearly erroneous," even though "[t]he ultimate determination of habitual residence is a mixed question of law and fact to which we will apply de novo review" (internal quotation marks omitted) (alteration in original)); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009) ("We cannot conclude that the district court was clearly erroneous in its conclusion that there was no shared parental intent to abandon the United States as the quadruplets' habitual residence."); *Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009) ("Determinations of intent [in the context of a Hague Convention petition] . . . involve questions of fact and the Court must defer to the district court's findings unless they are clearly erroneous."); *Koch v. Koch*, 450 F.3d 703, 710 (7th Cir. 2006) ("To be clear, determinations of intent [in the context of a Hague Convention petition] involve questions of fact and we will defer to the district court's findings on intent unless they are clearly erroneous."); *Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005) (observing that it is "the

No. 13-20039

At least one court has found that it is possible for a young child to have no habitual residence when there is no evidence of a shared intention for the child to be settled in any particular location. *See Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003) ("[A] newborn child born in the country where his . . . parents have their habitual residence could normally be regarded as habitually resident in that country. Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem, however, that the child will normally have no habitual residence until living in a country on a footing of some stability." (quoting Dr. E. M. Clive, "The Concept of Habitual Residence," *The Juridical Review part 3*, 138, 146 (1997))); *id.* at 333 ("[W]here the conflict [between the parents] is contemporaneous with the birth of the child, no habitual residence may ever come into existence.").

The mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence. Indeed, we and our sister circuits have held that parents have not established a new habitual residence despite a significant amount of time in a new country. *See, e.g.*, *Mozes*, 239 F.3d at 1083 ("These facts certainly show that the Mozes children, as the district court remarked, spent a very full year in the United States. But they do not point

---

[district] court's task to determine the intentions of the parents as of the last time that their intentions were shared. Clearly, this is a question of fact in which the findings of the district court are entitled to deference, and we consequently review those findings for clear error."); *Ruiz*, 392 F.3d at 1252–53 (11th Cir. 2004) ("'Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court.'" (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1075–76 (9th Cir. 2001))); *cf. Kanth v. Kanth*, 232 F.3d 901, at *2 (10th Cir. 2000) (unpublished) ("The district court's factual finding that Australia was not the habitual residence of the children is not clearly erroneous.").

unequivocally to the conclusion that, at the time Michal petitioned for their custody, the children had ceased to be habitually resident in Israel." (internal quotation marks and citations omitted)).

In *Mozes*, both parents were Israeli citizens. 239 F.3d at 1069. The father consented for the mother and the children to "remain in the United States for fifteen months, though they disagree as to what understanding existed beyond that." *Id.* The district court found that the United States had become the children's habitual residence, but the Ninth Circuit reversed, explaining that context, rather than specific periods of time spent in one location or another, is key to the concept:

> Being habitually resident in a place must mean that you are, in some sense, "settled" there—but it need not mean that's where you plan to leave your bones. Nor could we justify limiting habitual residence to persons who settle in an area for some particular motive. All of this is true. None of it is very useful, however, when attempting to decide a borderline case. Even the child who goes off to summer camp arguably has a "settled purpose" to live there continuously "for a limited period." No one would seriously contend that the summer camp is the child's habitual residence, but the notion of "settled purpose" alone is powerless to tell us why not.

*Id.* at 1074 (internal citations omitted).

As multiple courts have noted, "the difficult cases arise when the persons entitled to fix the child's residence do not agree on where it has been fixed." *Ruiz*, 392 F.3d at 1253; *see also Mozes*, 239 F.3d at 1074. Much of the existing case law discussing a child's habitual residence involves situations where the parents were still together at the time of the child's birth, made plans for the child's future, and only later did the family unit begin to dissolve. In these situations, the court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed.

17

*See, e.g., Gitter*, 396 F.3d at 133; *Mozes*, 239 F.3d at 1074–76. In contrast, Rendon and Berezowsky's relationship ended before PARB's birth, and the record does not indicate that the two parents have ever shared any plans regarding his upbringing or future.

A.

The district court concluded that Rendon and Berezowsky intended to make Mexico PARB's habitual residence. The district court devoted only one paragraph to the habitual residence analysis, and made the following statements in support of its conclusion that Mexico was PARB's habitual residence:

> Although [PARB] was born in the United States, the facts establish that the parents intended to make Mexico [PARB's] habitual residence. Specifically, [Berezowsky] and [Rendon] are both Mexican nationals, they met while residing in Mexico, they are not citizens of the United States, do not own real property in the country, and do not have immigration status that allows them to permanently reside here. Moreover, [Rendon] moved [PARB] to Mexico pursuant to a Texas court order that designated Mexico as [PARB's] place of residence. In the Texas [O]rder, both parents listed Mexico as their place of residence. [Rendon] admitted, and the evidence establishes, that he represented to the Mexican courts that his residence was Mexico. In other words, the evidence establishes that neither parent has meaningful or deep-rooted ties to the United States. Moreover, [PARB] resided in Mexico for approximately thirteen months and was attending school there before [Rendon] removed him to the United States. Therefore, based on these undisputed facts, the Court concludes that Mexico was [PARB's] habitual residence.

*Berezowsky v. Ojeda*, No. 4:12-CV-03496, 2013 WL 150714, at *4 (S.D. Tex. Jan. 14, 2013). Only the first line of this paragraph references parental intent.

In reaching this conclusion, it appears that the district court misunderstood what is required to form a shared parental intent for purposes of the habitual residence determination. A shared parental intent requires

that the parents actually *share* or jointly develop the intention.  In other words, the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together.  *See, e.g.*, *Larbie*, 690 F.3d at 310; *Mozes*, 239 F.3d at 1081 (reversing the district court's habitual residence determination when "the district court was able to say only that Arnon and Michal had discussed the possibility of extending the stay for one additional year, and that they may have even come to such an understanding.  The district court did not find that they had actually reached such an understanding." (internal quotation marks and citations omitted)); *Gitter*, 396 F.3d at 133 ("Once courts have resolved where the parents *mutually* intended the child's habitual residence to be, they have generally concluded that the child's habitual residence, in fact, accords with that parental intent.") (emphasis added).  Here, the district court did not find that the parents reached an agreement to make Mexico PARB's habitual residence.  Instead, the district court focused on the fact that "neither parent has meaningful or deep-rooted ties to the United States."  In doing so, the district court ignored the primary consideration in the habitual residence determination: *shared* parental intent.

Even accepting all of the facts cited by the district court as true, those facts cannot support a finding of shared parental intent as understood for purposes of the Hague Convention.  In the district court's brief analysis, the court never found that Rendon and Berezowsky reached an agreement or meeting of the minds regarding PARB's future.  Likewise, the district court did not make a finding that Berezowsky and Rendon intended to abandon Texas as PARB's habitual residence.  Nor does the record here support a determination that the parents formed a shared intent to make Mexico PARB's habitual residence.  Berezowsky does not even argue that she and Rendon reached an agreement on this issue.  Instead, she tries to establish that both

she and Rendon separately formed the intent to change PARB's habitual residence, and then argues that this could serve as the basis for a shared parental intent. We disagree, and hold that Berezowsky has failed to meet her burden to establish that she and Rendon shared an intent to change PARB's habitual residence.

i.

In an effort to defeat the 410th District Court of Texas's contrary determination, Berezowsky concedes that Texas was originally PARB's habitual residence, but argues that Mexico has supplanted Texas as PARB's current habitual residence. Berezowsky asserts that the Texas Order, which limited PARB's primary residence to one of three areas in Mexico, established Mexico as PARB's new place of habitual residence. In doing so, Berezowsky mistakenly conflates that idea of a *primary residence* with a *habitual residence*. Berezowsky offers no support for the proposition that the two terms are interchangeable. The Texas Family Code does not define "primary residence" and we are not aware of any cases that interpret it in a way that would suggest that the term means "habitual residence" under the Hague Convention. As a result, the fact that the Texas Order designated Mexico as PARB's primary residence is insufficient to prove that Mexico also became his habitual residence. *Cf. Barzilay*, 600 F.3d at 921 ("Sagi's claim that the consent judgment and repatriation agreement determine his children's habitual residence fails for the simple reason that those agreements are not stipulations of habitual residence. Sagi's characterization of them as such, with virtually no reference to their actual terms, is little more than ipse dixit. Neither of them uses the term 'habitual residence' or says anything about the relevant facts."); *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) ("A person

may have only one habitual residence, and it should not be confused with domicile.").

In addition, nothing in the Texas Orders suggests that the 410th District Court of Texas ever gave up jurisdiction over this case. Indeed, the 410th District Court of Texas issued a clarifying order in February 2012 explaining that the Texas Order "is a valid, existing, final and enforceable order, and the matter of the primary custody of the child PARB is res judicata," and that unless and until an appellate court reversed the Texas Order, that it would remain both final and enforceable. This subsequent action by the 410th District Court of Texas is a strong indication that the court did not think that it had lost jurisdiction over this custody dispute.

Moreover, Berezowsky has not demonstrated that the Texas Order evinces the necessary shared parental intent to establish a habitual residence under the Hague Convention. In *Barzilay*, both parents were Israeli nationals who had lived in Missouri for several years when they decided to divorce. As part of the divorce, the parents agreed to move the children back to Israel if either parent decided to return to Israel. 600 F.3d at 915. The father subsequently returned to Israel, but the mother refused to permanently follow with the children. *Id.* The father then filed an action for wrongful removal under the Hague Convention, arguing that Israel was the children's habitual residence as a result of the parents' "repatriation agreement" in the divorce decree. *Id.* at 916. Despite this "repatriation agreement," the Eighth Circuit nonetheless affirmed the district court's holding that the United States—rather than Israel—was the children's place of habitual residence. *Id.* at 919. As the *Barzilay* court explained:

> We also reject the claim that either the Kfar Saba consent judgment or the Missouri repatriation agreement is an enforceable

stipulation of the children's habitual residence. . . . The notion that parents can contractually determine their children's habitual residence without regard to the actual circumstances of the children is thus entirely incompatible with our precedent. Indeed, Sagi *has not cited a decision by any court anywhere in the world embracing such a proposition.*

*Id.* at 20 (emphasis added).[8]

Likewise, the mere fact that the Texas Order designates Mexico as PARB's primary residence is insufficient to demonstrate a shared parental intent for Mexico to become his habitual residence. Indeed, there is an even weaker case for such an argument here: In *Barzilay*, the parents *agreed* to the divorce provision that would require moving the children to Israel. Here, Berezowsky has not presented any evidence indicating that she and Rendon jointly asked for, or agreed to, the 410th District Court of Texas's decision to choose Mexico as PARB's primary residence. Finally, the Texas Order itself makes clear that PARB's primary residence can be changed. Indeed, Rendon requested and received a revised order from the 410th District Court of Texas just four months later, which lifted the geographic restriction on where PARB would primarily reside.[9] On these facts, we cannot say that the Texas Order

---

[8] We need not decide today whether a parent's concession is sufficient to establish a child's habitual residence. Nor do we need to decide whether Texas is PARB's habitual residence, or whether he has any habitual residence at all. The Hague Convention is only applicable if a child is wrongfully removed from his or her place of habitual residence. Thus, Berezowsky must prove that some place other than Texas (here, Mexico) was PARB's habitual residence in order to fall within the Hague Convention's protections. Berezowsky has not met her burden in showing that Mexico was PARB's habitual residence. We are thus able to resolve this case without addressing the difficult question of what is required to create a child's initial habitual residence when a baby is born into contentious circumstances such as these, and decline to reach that issue.

[9] The dissenting opinion argues that the fact that the parents moved to Mexico in response to the Texas Order suggests an intent to make Mexico PARB's habitual residence. We respectfully disagree. If anything, the fact that Rendon continued to file numerous motions with the 410th District Court of Texas even after moving to Mexico suggests that he

demonstrates a shared parental intent to make Mexico PARB's habitual residence.

ii.

Because the Texas Order does not establish that Mexico became PARB's habitual residence, we now turn to Berezowsky's other arguments.

In arguing that there was a shared parental intent to abandon Texas and instead make Mexico PARB's habitual residence, Berezowsky does not even try to claim that the two parents reached an agreement to raise PARB in Mexico. Instead, she contends that they each individually decided to abandon Texas as PARB's habitual residence, and that this "mutual intent" is sufficient. Berezowsky does not point to any case law supporting her novel argument that parents can form the *shared intent* necessary to abandon a prior habitual residence without—at some point in the child's life—making a *joint decision* to raise the child in the new country. Absent evidence of a parental agreement, Berezowsky has not shown that she and Rendon possessed the shared intent to make Mexico PARB's habitual residence.

Even assuming *arguendo* that the separate, uncoordinated intentions of two parents could form the necessary *shared intent* to change a child's habitual residence, Berezowsky has not met her burden in proving that each of the parents here had such an intent. First, Berezowsky has not demonstrated that she intended to make Mexico PARB's habitual residence. Although she now asserts that she intended to abandon Texas, we agree with our sister circuits

did not intend to make Mexico PARB's habitual residence, as he recognized the 410th District Court of Texas as the appropriate court (with continuing jurisdiction) to be making these custody determinations. The fact that Rendon complied with a valid court order is not sufficient evidence for Berezowsky to meet her burden of proving a shared parental intent to change PARB's habitual residence.

that "[i]n cases where there is a dispute regarding a child's habitual residence, 'the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence.'" *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009) (quoting *Gitter*, 396 F.3d at 135). We therefore examine the evidence presented by Berezowsky, and conclude that she has not demonstrated that she had such an intent.

PARB is an American citizen, and spent the first two years of his life in the United States because Berezowsky chose to move to the United States while pregnant. Berezowsky argues that moving to Mexico, and subsequently staying there with PARB for thirteen months, demonstrated her intent to make Mexico his new habitual residence. But as Berezowsky herself makes clear, her move had little to do with a settled intention to raise PARB in Mexico. She admits that she "originally opposed the move to Mexico, but intended to live in the same place as her son." She claims that "even if she had initially hoped that PARB would only temporarily reside in Mexico, she chose to remain in Mexico after obtaining sole custody and had no intention of moving back to Texas." By her own account Berezowsky made the move to *follow* PARB, not because she intended to raise him in Mexico. While she did remain in Mexico with PARB after obtaining custody of him from a Mexican court, this decision was no doubt influenced by the fact that a Texas court had previously given, and again subsequently gave, Rendon primary custody. The Hague Convention was designed to *prevent* this exact kind of forum-shopping in child custody cases. To hold that a parent may unilaterally establish their child's habitual residence by taking actions actually designed to keep the child in a favorable forum, while thwarting valid court orders, would undermine that purpose.

24

Courts have also looked at the circumstances of the family's move when assessing parental intent. Selling the family's home or cars, for example, may indicate the intention to make a more permanent move. *See, e.g.*, *Nicolson*, 605 F.3d at 102 (mother packed or shipped large quantity of belongings from Australia to the United States and transferred the title to the family's car); *Silverman*, 338 F.3d at 898 (family sold home in the United States and shipped household goods to Israel). Here, Berezowsky's move does not unequivocally demonstrate the same permanence. She left her parents' home in Texas, but there is nothing in the record to suggest that she could not return to living in this house at any time. Indeed, her parents previously began the process of conveying their house to her.

In other cases, parties have presented specific evidence about the belongings that they brought with them to the new country in order to demonstrate an intention to make a more or less permanent move. *See, e.g., Larbie*, 690 F.3d at 299 (mother left substantially all of her belongings in United States when flying to England); *Nicolson*, 605 F.3d at 102; *Maxwell*, 588 F.3d at 248 (mother brought a number of household items from the United States to Australia, including bedding, dishes, kitchen supplies, and summer clothing); *Koch*, 450 F.3d at 714 (family took all possessions except a few large items from the United States to Germany); *Silverman*, 338 F.3d at 898; *Delvoye*, 329 F.3d at 332 (habitual residence not established when mother brought only a few suitcases to Belgium and left the rest of her belongings in New York).

In contrast, Berezowsky offers only the broad assertion that she brought all of her belongings with her to Mexico. The only evidence in the record to support her claim is her own vague testimony that it took her two days to pack her things to move because "[she] had too much stuff to take to Mexico." The

Southern District Court did not make any findings about the items that either Berezowsky or Rendon brought to Mexico or left in Texas.    Rather, the Southern District Court found only that both parents were residing in Mexico after October 18, 2011.    In addition, Berezowsky has already conceded that she was hoping to only temporarily reside in Mexico, which undermines her claim that she moved these belongings out of a desire to settle outside of the United States.

Moreover, it is not at all clear that this kind of evidence has the same relevance in a case such as this one, where the parents' moves are driven by an attempt to be near the child, to move the child away from the other parent, or simply a desire to avoid the effect of court orders, rather than a cohesive plan to raise the child in a particular place.    Berezowsky testified that she only returned to Mexico after learning that Rendon had moved there with PARB. She filed a suit seeking custody of PARB within weeks of arriving, which at the very least suggests that she and Rendon had not reached a shared intention to raise their child together in Mexico.

Likewise, Rendon's decision to remain in Mexico during the ensuing months while he battled with Berezowsky over PARB's custody does not indicate a shared intent to raise PARB there.    It is perfectly reasonable for a parent who has been stripped of his custodial rights to a child, and who is still actively fighting to get them back, to remain in the country where the child is located without forming any intent to stay there with the child.    Allowing either party to impact the habitual residence determination through judicial gamesmanship, or by hiding the child in a favorable forum would be at odds with the stated goals of the Hague Convention.    *See Larbie*, 690 F.3d at 310 (noting that the Hague Convention is meant to deter parents from engaging in international forum shopping in custody cases); *see also Gitter*, 396 F.3d at 134

("The object of the Convention is to dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle."); *Ruiz*, 392 F.3d at 1255 (upholding the district court's determination that the children's habitual residence had not changed despite the fact that both parents moved to Mexico with the children for almost three years, the father began working for his family business, and they began construction on a home in Mexico because the "family was in limbo during its stay in Mexico").

## B.

Berezowsky also asserts that—despite his arguments to the contrary—Rendon demonstrated an intent to make Mexico PARB's habitual residence. In support of this argument, Berezowsky offers an e-mail from Rendon's attorney to her attorney sent just before Rendon and PARB moved to Mexico in October 2011. The e-mail states that:

> [T]he decree is very explicit as to the residences of both Pablo and [PARB.] [PARB] lives at Pablo's home – his address is in the decree. There is a domicile restriction to three different areas, but the address in the decree is set forth as is Michelle's address is in the same place in the decree (which is Kingwood[, Texas]). The decree very specifically sets forth (unless otherwise agreed upon by the parties) when and where the possession takes place at Pablo['s] home [in] Mexico. Pablo has no intention of returning to Montgomery County. If either he or Michelle change their residences, then they must give timely notice to both the court and each other. Accordingly, if Michelle chooses to go to Mexico, Pablo will continue to act as if she resides in Kingwood unless she provides notice as set forth in the decree. Pablo will always have [PARB] at his home for pick up and drop off . . . . Michelle does NOT have a residence in Mexico and Pablo does NOT have a residence in the United States.

This e-mail does not indicate that Rendon intended to abandon Texas as PARB's habitual residence. Instead, the e-mail explains that the Texas Order

required Rendon to take PARB to this particular region of Mexico. It does not make any statements about Rendon's plans for PARB's future, and does not indicate how long he intended to live with PARB in Mexico. It mentions the ability of the parties to change their addresses and "when and where" possession of PARB will take place. While Rendon did notify the 410th District Court of Texas that he had no intention of returning to the particular Texas county where the 410th District Court of Texas was located, he made no such statements about his intentions to stay or remain in any other part of the United States or Mexico. Nor does this e-mail indicate any shared intentions by the parents for PARB to be settled in Mexico. It explicitly notes that Berezowsky did not have a residence in Mexico, and indicates that Rendon would continue to act as though she resided in Texas. Far from suggesting a settled intent by the parents, this e-mail instead shows that the parents had not yet clarified issues related to PARB's future.

Likewise, the Texas Order designating Mexico as PARB's primary residence does not establish Rendon's settled intent to raise PARB in Mexico. This is especially true in light of the fact that Rendon requested and received a revised order lifting this geographic restriction just four months after receiving the Texas Order. By that time, Rendon was no longer in possession of PARB, and was not in a position to determine where PARB would live. Just weeks after Rendon regained possession of his son, he moved back to Texas. These are not the actions of a man with a settled intention for his son to habitually reside in Mexico.

As part of the parental intent inquiry, our sister circuits have also looked to whether the parties quit their jobs in one country and sought new employment in the country where they have moved. *See, e.g.*, *Maxwell*, 588 F.3d at 252. Given the particular facts in this case, the parents' employment

is not especially illuminating in assessing their shared intent.  Here, the record indicates that both Berezowsky and Rendon worked for businesses owned by their respective families.  Berezowsky testified that she worked for her family's business beginning 2002, left to attend school for the two years while she resided in Texas, and began working from home for her family's company once she returned to Mexico.  As the parties were engaged in custody battles for nearly the entirety of this time period, it seems equally likely that the location of their employment was driven by a desire to be near PARB until the custody issues were resolved, rather than a long-term plan to raise him in a particular location.

The Southern District Court made much of the fact that both Berezowsky and Rendon are Mexican nationals, with no immigration status that allows them to permanently reside in the United States.  While these facts might indicate that Texas was not PARB's habitual residence, they do not prove that the parents established Mexico as the child's habitual residence.  Indeed, given the constant cross-border battle over his custody, it is possible that PARB has no habitual residence.  *See Delvoye*, 329 F.3d at 334.  While it is true that both parents listed locations in Mexico as their residences on the Texas Order, the record also shows that neither parent was living in Mexico at the time that they made these representations to the 410th District Court of Texas.  Like Berezowsky, Rendon's parents also had a home in the greater Houston area where he was able to reside with PARB.   Indeed, he did so during the proceedings in the Southern District Court.

It does not appear that the decision for PARB to reside in either Texas or Mexico was connected to a shared intention to settle their son in that place; rather, the geographic decisions seem wholly dependent on where the parents happened to be fighting their court battles at the time, and where each parent

thought they could gain an advantage. Within the year that he spent in Mexico, PARB was moved from his father's home to his mother's home, and then further uprooted when Berezowsky moved from Ceurnavaca to Mexico City. Unfortunately, in this case it is hard to say that either parent "planned" for anything other than to keep PARB in the friendliest forum possible. Such forum shopping does not evince a plan to raise and settle a child in a particular location. *Cf. Ruiz*, 392 F.3d at 1259 (noting that a new habitual residence was not established when "attempts to salvage the marriage, rather than commitment to staying in the new locale are what determined the length of the stay").

Given the constant disagreement and multiple cross-border moves in the span of a few years, Berezowsky has not met her burden in proving that she and Rendon shared an intent or settled purpose regarding their child's habitual residence. Indeed, it does not appear that Berezowsky and Rendon have shared any intention or settled purpose regarding their child since his birth.[10] "In conclusion, the district court's determination of habitual residence in this case appears to have relied upon an understanding of that term that

---

[10] Some courts have held that even absent a shared parental intent, a child may acquire a habitual residence by becoming sufficiently acclimated to a new environment. *See, e.g.*, *Gitter*, 396 F.3d at 134; *Mozes*, 239 F.3d at 1081. The approach taken by our circuit has instead emphasized shared intentions. *See Larbie*, 690 F.3d at 311 ("Regardless of the ties that K.L. unavoidably developed in the U.K., moreover, the above authorities demonstrate that his young age requires Derek and Evelyn's shared intentions be the primary focus in the habitual residence inquiry here.").

Even if we were to consider PARB's acclimation, Berezowsky has not met her burden in demonstrating that PARB's "relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Gitter*, 396 F.3d at 134 (citing *Mozes*, 239 F.3d at 1081).

No. 13-20039

gives insufficient weight to the importance of shared parental intent under the Convention." *Mozes*, 239 F.3d at 1084.[11]

We are without power to reach the merits of the underlying custody dispute. *See* Hague Convention art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); 42 U.S.C. § 11601(b)(4). We cannot provide PARB with the certainty which he has thus far been deprived, but it is our great hope that his parents will find a way to bridge their differences for the sake of the child that they have brought into the world together.

## III.

For the reasons stated in this opinion we VACATE the district court's order and REMAND with instructions to dismiss. We DENY Berezowsky's interim motion requesting that this appeal be dismissed as moot.

---

[11] Because we hold that Berezowsky has not met her burden in proving that Mexico was PARB's habitual residence, we do not reach Rendon's two additional arguments on appeal. Rendon argues that, even assuming *arguendo* that Mexico was PARB's place of habitual residence, PARB's removal by Rendon would not be "wrongful" under the Hague Convention for two reasons. First, he argues that Berezowsky was not exercising her custodial rights over PARB at the time of removal. Second, he notes that the Convention includes several affirmative defenses, including for situations where the petitioning parent consented to the child's removal from the country of habitual residence. *See Larbie*, 690 F.3d at 308. Here, Berezowsky consented to have the 410th District Court of Texas make the initial custody determination. *See id.* ("Crucially, consent for a particular tribunal to make a final custody determination—which may be established by entry of a temporary custody order—suffices to establish an affirmative defense under the Convention."). The 410th District Court of Texas maintained exclusive continuing jurisdiction over this custody dispute. Pursuant to that authority, the 410th District Court of Texas modified the Texas Order and gave Rendon sole custody over PARB, and the exclusive right to designate PARB's primary residence with no geographic restrictions. Rendon argues that this gave him the legal power to bring PARB from Mexico to Texas. Rendon further argues that by consenting to the 410th District Court of Texas's power to make the custody determination, Berezowsky thus consented to Rendon's removal of PARB from Mexico when he did so pursuant to an order from the 410th District Court of Texas.

No. 13-20039

HAYNES, Circuit Judge, dissenting:

Although I am filing a dissent, I wholeheartedly agree with the majority opinion's statement:  "[I]t is our great hope that [PARB's] parents will find a way to bridge their differences for the sake of the child that they have brought into the world together."  Maj. Op. at 30.  Our court cannot function as mediators here, but we can say with one voice:  "You owe your child better than this" and urge both parents to make a concerted effort to settle this matter in PARB's, not their own, best interests.

That said, as an appellate case, this appeal presents a narrow question: Did Berezowsky and Rendon share an intent to make Mexico PARB's habitual residence?  The district court found that they did, and that finding must be affirmed unless it is clearly erroneous.[1]  Because, in holding the opposite, the majority opinion fails to give the necessary deference to the district court's finding, and instead engages in its own independent weighing of the facts, I respectfully dissent.

The majority opinion correctly notes that the district court's determination of a child's habitual residence presents a mixed question of law and fact that we review *de novo.*  Maj. Op. at 13; *see Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1455 (2013); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010) (observing that some deference should be awarded to the district court's application of the habitual residence standard); *Papakosmas v. Papakosmas*, 483 F.3d 617, 623 (9th Cir. 2007) (noting that *de novo* review in this context is not a "full *de novo* review" and

---

[1] I agree with the majority opinion's suggestion that both sides have engaged in forum shopping.  We are not here tasked with determining who has "clean hands," and that is a fortunate thing for the parties.

32

that the district court's decision as to habitual residence is still entitled to some deference). The majority opinion also correctly "join[s] our sister circuits in treating the shared intent determination as a factual finding that is reviewed for clear error." Maj. Op. at 15 n.7. Under this standard, we must affirm the district court's determination that Berezowsky and Rendon shared an intent to make Mexico PARB's habitual residence unless it is implausible in light of the record as a whole. *See Larbie*, 690 F.3d at 306 ("A factual finding survives review so long as it is plausible in the light of the record as a whole." (citation and internal quotation marks omitted)). I observe that deferential review of a factfinder's determination of questions involving credibility is a hallmark of appellate review. *See Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985) (emphasizing the deference appellate courts must pay to trial courts' factual findings and noting the "special deference to be paid credibility determinations" under Federal Rule of Civil Procedure 52(a)); *see also Estate of Lisle v. C.I.R.*, 541 F.3d 595, 601 (5th Cir. 2008) (citing *Anderson*, 470 U.S. at 573–75). Intent is certainly one such issue where credibility is a key part of the equation. *See, e.g., Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466,  487 n.68 (5th Cir. 2011) (collecting cases).

The district court's finding that Berezowsky and Rendon shared an intent to make Mexico PARB's habitual resident is plausible in light of the record as a whole and should be affirmed. After a two-day evidentiary hearing during which Berezowsky and Rendon testified, the district court examined the facts and found that Berezowsky and Rendon shared an intent to make Mexico PARB's habitual residence[2]:

---

[2] The majority opinion faults the district court for discussing the habitual residence determination for only one paragraph, and for "misunder[standing] what is required to form a shared parental intent for purposes of the habitual residence determination. A shared

Although [PARB] was born in the United States, the facts establish that the parents intended to make Mexico [PARB's] habitual residence. Specifically, [Berezowsky] and [Rendon] are both Mexican nationals, they met while residing in Mexico, they are not citizens of the United States, do not own real property in the country, and do not have immigration status that allows them to permanently reside here. Moreover, [Rendon] moved [PARB] to Mexico pursuant to a Texas court order that designated Mexico as [PARB's] place of residence. In the Texas [O]rder, both parents listed Mexico as their place of residence. [Rendon] admitted, and the evidence establishes, that he represented to the Mexican courts that his residence was Mexico. In other words, the evidence establishes that neither parent has meaningful or deep-rooted ties to the United States. Moreover, [PARB] resided in Mexico for approximately thirteen months and was attending school there before [Rendon] removed him to the United States. Therefore,

---

parental intent requires that the parents actually *share* or jointly develop the intention. In other words, the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together." Maj. Op. at 18 (citing *Larbie*, 690 F.3d at 310, and *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)) (emphasis in original). I disagree that the parents must testify that they sat down together and explicitly agreed to a child's habitual residence to have a "shared intent." These cases often involve parents who "no longer share an intent on the child's habitual residence" at the time of trial and who may have formed any mutual intent during a trip abroad with an originally ambiguous intended duration. *Koch v. Koch*, 450 F.3d 703, 713 (7th Cir. 2006); *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004) (describing categories of shared intent cases, including where a court finds "a shared settled purpose, despite one parent having had qualms about the move," if "the family has jointly taken all the steps associated with abandoning habitual residence," and another category "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration," and "despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely." (internal citations and quotation marks omitted)); *Mozes*, 239 F.3d at 1075 ("Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended."). Parties' actions demonstrate their shared intent as well as words. *Id.*

To the extent that the majority opinion concludes the district court applied the wrong legal standard in making factual findings about shared intent, the better practice would be to remand for further findings instead of the appellate court finding the facts itself and rendering a decision on the merits. *See, e.g., Martin v. Bedell*, 955 F.2d 1029, 1031, 1036 (5th Cir. 1992) (remanding for limited fact-finding in light of legal standards announced in the decision).

No. 13-20039

based on these undisputed facts, the Court concludes that Mexico
was [PARB's] habitual residence.

*Berezowsky v. Ojeda*, No. 4:12-CV-03496, 2013 WL 150714, at \*4 (S.D. Tex.
Jan. 14, 2013).  This finding is plausible in light of the record as a whole.[3]

As the district court observed, Rendon moved PARB to Mexico pursuant
to the Texas Order, which unequivocally provided that "the primary residence
of [PARB] shall be relocated and restricted to the geographical area comprised
by the following contiguous geographic areas situated in and around the
Federal District or the State of Morelos of the United Mexican States: 1.
Delegacion Coyoacán, Mexico Distrito Federal; 2. Delegacion Tlalpan, Mexico
Distrito Federal; and/or 3. Cuernavaca, Morelos."  It also provided Rendon
"[t]he exclusive right to designate the primary residence of [PARB] within the
following contiguous geographic areas situated in and around the Federal
District or the State of Morelos of the United Mexican States: a. Delegacion
Coyoacán, Mexico Distrito Federal; b. Delegacion Tlalpan, Mexico Distrito
Federal; and/or c. Cuernavaca, Morelos."  The Texas Order further explained
that "once the relocation of [PARB] to the above described geographical area is
complete, the parties shall not remove [PARB] from that area for the purpose
of changing the primary residence of [PARB] until modified by further order of
the court of continuing jurisdiction or by written agreement signed by the
parties and filed with the court."

---

[3] Again, the majority opinion appears to discount the district court's findings because
the district court did not specifically find that Berezowsky and Rendon reached a meeting of
the minds regarding PARB's future.  But the district court explicitly found that Berezowsky
and Rendon shared an intent to make Mexico PARB's place of habitual residence, and that
proves sufficient.  *See Berezowsky*, 2013 WL 150714, at \*4.  If more clarification is needed
based on the legal standard the court introduces in its majority opinion, then the case should
be remanded for further findings, instead of vacating the decision and remanding for
dismissal.

No. 13-20039

The majority opinion dismisses the significance of the Texas Order by concluding that its reference to PARB's "primary residence" does not establish that Mexico became his "habitual residence."[4]    Crucially, however, any difference between these phrases is irrelevant for determining the intent of Berezowsky and Rendon because it is the parents' actions in response to the Texas Order—not the order itself—that demonstrates their shared intent to make Mexico PARB's habitual residence.    Specifically, Berezowsky and Rendon both respected the decision of the 410th District Court of Texas and agreed to abide by it by settling in Mexico with PARB.    They informed the 410th District Court of Texas that their mailing and residential addresses would be located in Mexico.    Even Rendon's attorney at the time confirmed Rendon's intent in an email to Berezowsky's attorney, which explained that Rendon "has no intention of returning to Montgomery County," Texas.[5]    After

---

[4] Relying on *Barzilay v. Barzilay*, 600 F.3d 912 (8th Cir. 2010), the majority opinion also states that "the mere fact that the Texas Order designates Mexico as PARB's primary residence is insufficient to demonstrate a shared parental intent for Mexico to become the habitual residence."  However, *Barzilay* is easily distinguishable.  In *Barzilay*, the divorcing parents agreed through a repatriation agreement that their children would be relocated to Israel if either parent moved there.  *Id.* at 915.  However, following the divorce, the father eventually moved to Israel, but the mother refused to move there permanently with the children.  The court concluded that Israel could not supplant the United States as the children's habitual residence based only on the repatriation agreement.  *Id.* at 920. Contrarily, Berezowsky and Rendon not only acquiesced to moving to Mexico with PARB pursuant to the Texas Order, but actually implemented this agreement.  Indeed, this shared decision to settle in Mexico appears to be one of the only things on which these parties have agreed amidst almost constant litigation.

[5] Throughout its analysis, the majority opinion weighs particular pieces of evidence, including this email and Berezowsky's assertion that she brought all of her belongings to Mexico, to suggest that such evidence does not establish that Berezowsky and Rendon shared an intent to make Mexico PARB's place of habitual residence.  First, no single piece of evidence in this case, considered alone, can establish a shared intent to make Mexico PARB's place of habitual residence.  Second, and more fundamentally, while such evidence could be viewed as not necessarily evincing a shared intent with respect to PARB's habitual residence, it is not implausible to interpret such evidence (when viewed in light of all of the facts) as

moving to Mexico, Rendon continued to represent to Mexican courts that his residence was in Mexico.  PARB began attending school in Mexico and resided there for approximately thirteen months before Rendon removed him to the United States.

Unfortunately, that shared intent did not lead to harmony.  Shortly thereafter, Berezowsky and Rendon found themselves seeking relief in Mexican courts and the 410th District Court of Texas.[6]  Indeed, the majority opinion observes that Rendon received an order lifting the Texas Order's geographical restriction just months after the order was entered and the parties moved to Mexico.[7]  Nevertheless, while the parties' intent may no longer be aligned, the record supports the district court's conclusion that the last (and seemingly only) time they shared an intent to make a particular place PARB's habitual residence was when all three individuals moved to Mexico in

establishing a shared intent.  Again, in a situation where reasonable minds can disagree in weighing the evidence concerning parents' shared intent, we must defer to the district court's finding when it is plausible in light of the record.  *See Larbie*, 690 F.3d at 306.

[6] Berezowsky also appears to have ceased her compliance with the Texas Order by failing to take the steps necessary to have Rendon recognized as PARB's father in Mexico. While Berezowsky's apparent failure to implement all aspects of the Texas Order (and other similar conduct) certainly cannot be condoned, the issue in this appeal is limited to determining whether she and Rendon shared an intent to make Mexico PARB's place of habitual residence.

[7] The question of whether the 410th District Court of Texas had exclusive, continuing jurisdiction to enter its Clarifying Order in February 2012 is a red herring with respect to the habitual residence analysis.  This order purported to make Rendon PARB's sole managing conservator and give him sole custody and the exclusive right to designate PARB's primary residence with no geographic restrictions.  Even assuming the court had exclusive, continuing jurisdiction to enter this order, Berezowsky maintains that she was not properly served with Rendon's Petition to Modify and did not participate in the proceedings that led to this order. Indeed, she has refused to abide by the order.  Therefore, without addressing whether Berezowsky may be bound by this order in other contexts, it cannot be said that the order helps establish a shared intent concerning PARB's habitual residence.

compliance with the Texas Order.  *See Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005) ("In nearly all of the cases that arise under the [Hague] Convention, however, the parents have come to disagree as to the place of the child's habitual residence.  It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared.  Clearly, this is a question of fact in which the findings of the district court are entitled to deference, and we consequently review those findings for clear error.").

In sum, the district court observed firsthand Berezowsky and Rendon's testimony and weighed their actions following the Texas Order to determine that they shared an intent to make Mexico PARB's habitual residence.[8] *Berezowsky*, 2013 WL 150714, at *4.  Such a determination is plausible in light of the evidence and, therefore, must be affirmed.

In addition to proving that Mexico was PARB's place of habitual residence, Berezowsky's claim for wrongful removal also required her to show that Rendon's removal violated her "rights of custody" under Mexican law and that she was exercising those rights at the time of removal.[9]  *See* 42 U.S.C. § 11603(e)(1); *Larbie*, 690 F.3d at 307.  The district court concluded that she made such a showing because "the 24th Family Court [in Mexico] gave [Berezowsky] full and exclusive parental rights over [PARB]," and Berezowsky

---

[8] While not necessarily relevant to the habitual residence determination, it is worth noting that this finding respects the Texas jury's conclusion that PARB should reside with his parents in Mexico.  *See In re A.B.G.*, No. 09-11-00545-CV, 2013 WL 257311, at *2 (Tex. App.—Beaumont 2013, no pet.).

[9] Having concluded that Berezowsky failed to meet her burden with respect to the habitual residence determination, the majority opinion does not address these additional elements of a wrongful removal claim.

exercised those rights by, *inter alia*, taking PARB to school and providing for his welfare. *Berezowsky*, 2013 WL 150714, at *5–7. Rendon's argument on appeal concerning these elements is limited to his assertion that he had custodial rights over PARB based on the 410th District Court of Texas's Clarifying Order issued in February 2012. However, this order does not affect Berezowsky's rights of custody under the laws of Mexico, the country of habitual residence. *See Larbie*, 690 F.3d at 307. As such, I would hold that the district court did not err in concluding that Berezowsky demonstrated she had the rights of custody over PARB under Mexican law and was exercising them at the time of his removal.[10]

Because the district court did not err in concluding that Berezowsky established that PARB was wrongfully removed from Mexico, I would affirm the district court's grant of Berezowsky's petition. From the failure of the judgment to so hold, I respectfully dissent.

---

[10] Finally, as Rendon observes, we would not be bound to order the return of PARB if Rendon establishes one of "several narrow affirmative defenses to wrongful removal." *Sealed Appellant*, 394 F.3d at 343; *see also Larbie*, 690 F.3d at 308. While Rendon argued to the district court the affirmative defense that PARB's return presented a grave risk of harm to him, he argues on appeal that the affirmative defense of consent applies. The majority opinion does not reach the issue of consent because it alternatively concludes that Berezowsky failed to establish Mexico as PARB's habitual residence. I also would not reach the issue of consent because Rendon failed to plead it as an affirmative defense and did not raise it before the district court. *See* FED. R. CIV. P. 8(c); *John R. Sand & Gravel v. United States*, 552 U.S. 130, 133 (2008); *Celanese Corp. v. Martin K. Eby Constr. Co., Inc.*, 620 F.3d 529, 531 (5th Cir. 2010) ("The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal."). Indeed, in his Answer, Rendon "admits that Petitioner has not consented to or acquiesced to the removal of [PARB] from Mexico and the nonreturn of [PARB] by Rendon. Petitioner's consent to remove [PARB] from Mexico is unnecessary."